958 A.2d 1 (2008)
403 N.J. Super. 146
MOUNTAIN HILL, L.L.C., Plaintiff-Appellant,
v.
TOWNSHIP COMMITTEE OF the TOWNSHIP OF MIDDLETOWN and the Planning Board of the Township of Middletown, Defendants-Respondents, and
Mountain Hill, L.L.C., Plaintiff-Appellant,
v.
Planning Board of the Township of Middletown, Defendant-Respondent, and
Mountain Hill, L.L.C., Plaintiff-Appellant,
v.
Township Committee of the Township of Middletown, Defendant-Respondent.
No. A-2404-06T2
Superior Court of New Jersey, Appellate Division.
Argued January 22, 2008.
Decided September 10, 2008.
*3 Gary E. Fox, Ocean Township, argued the cause for appellant (Fox & Melofchik, Ocean Township and Hill Wallack, attorneys, Princeton; Mr. Fox and Donald R. Daines, Princeton, on the brief).
Bernard M. Reilly, Red bank, argued the cause for respondent Township of Middletown (Dowd & Reilly, attorneys; Mr. Reilly, on the brief).
James H. Gorman, Shrewsbury, argued the cause for respondent Middletown Planning Board.
Before Judges STERN, COLLESTER and C.L. MINIMAN.
The opinion of the court was delivered by
C.L. MINIMAN, J.A.D.
Plaintiff Mountain Hill, L.L.C. (Mountain Hill), appeals from an order of partial judgment entered on April 22, 2005, in the consolidated actions of Middletown Township Planning Board v. Mountain Hill, L.L.C., Docket No. L-5008-03,[1] and *4 Mountain Hill, L.L.C. v. Township Committee of the Township of Middletown and the Planning Board of the Township of Middletown, Docket No. L-2378-04. The April 22, 2005, order declared that defendant Planning Board of the Township of Middletown (Planning Board) and defendant Township Committee of the Township of Middletown (Township Committee) complied with the statutorily required notice and procedure for approval and adoption of Adult Active Community (AAC) Ordinance No. 2004-2760 on April 7, 2004, and AAC Ordinance No. 2004-2798 on December 6, 2004. The order also determined that Middletown Township Mayor Joan Smith was not precluded from voting on either ordinance by virtue of an alleged conflict of interest.
Mountain Hill also appeals from an order of partial judgment entered on August 2, 2005, in the same two consolidated actions vacating the December 18, 2003, injunction against further applications by Mountain Hill to the Planning Board and determining that Mountain Hill's third Application for Development Permit filed on October 16, 2003, was subject to the "time-of-decision rule" and was, thus, governed by the December 6, 2004, AAC ordinance.
Last, Mountain Hill appeals from a November 17, 2006, final judgment dismissing all three complaints in Mountain Hill, L.L.C. v. Township Committee of the Township of Middletown and the Planning Board of the Township of Middletown, Docket No. L-2378-04, which challenged the April 7, 2004, AAC ordinance; Mountain Hill, L.L.C. v. Planning Board of the Township of Middletown, Docket No. L-5591-04, which challenged the 2004 Master Plan; and Mountain Hill, L.L.C. v. Township Committee of the Township of Middletown, Docket No. L-0296-05, which challenged the December 6, 2004, AAC ordinance; and declaring that the AAC ordinances were valid and not arbitrary, capricious or unreasonable.

I.
The history of Mountain Hill's efforts, spanning almost a decade at the municipal and trial court levels, to create a planned development on property fronting on Route 35 in Middletown called the "Town Center" ended with the November 17, 2006, final judgment dismissing all three actions pending against defendants. That history has been riddled with municipal conflicts of interest that were ignored at the municipal level. This project first came to our attention in 2002 when we affirmed a judgment invalidating Ordinance 2001-2632, which was applicable to Mountain Hill's property, on the ground that it was not adopted by a vote of two-thirds of all members of the governing body. Mountain Hill, L.L.C. v. Middletown Twp., 353 N.J.Super. 57, 62, 801 A.2d 412 (App.Div.), certif. denied, 175 N.J. 78, *5 812 A.2d 1110 (2002) (Mountain Hill I). In 2003 we affirmed a judgment invalidating Ordinance 2001-2617 applicable to Mountain Hill's property on the ground that a member of the governing body had a disqualifying conflict of interest that rendered the ordinance invalid. Mountain Hill, L.L.C. v. Middletown Twp., Nos. A-1968-01, A-2556-01 (App.Div. Apr. 16, 2003) (Mountain Hill II).
Earlier this year we decided that the Open Public Meetings Act (OPMA), N.J.S.A. 10:4-6 to -21, was not violated by discussions of the political ramifications of developing the subject property which occurred at Republican caucuses attended by members of the governing body and others. See Mountain Hill, L.L.C. v. Twp. of Middletown, 399 N.J.Super. 486, 506-07, 945 A.2d 59 (App.Div.2008) (Mountain Hill III). Mountain Hill III was the first of four appeals argued before us on January 22, 2008. Id. at 488, 945 A.2d 59. We have decided the second and third appeals concerning errors by the Zoning Board in a joint opinion filed today. Mountain Hill, L.L.C. v. Zoning Bd. of Adjustment of the Twp. of Middletown, 403 N.J.Super. 210, 958 A.2d 42, 2008 WL 4146182 (App. Div.2008) (Mountain Hill IV). This opinion resolves the issues presented in the fourth appeal and primarily concerns the events occurring after the denial of Mountain Hill's first and amended second as-of-right Applications for Development Permit filed between January 3, 2003, and August 27, 2003,[2] which we resolve today in Mountain Hill IV. Id. at 227-28, 958 A.2d at 52-53.
To understand the context in which the present dispute arose, we briefly review some of the history of Mountain Hill's effort to develop its property and Middletown's effort to avoid that development. On June 12, 1992, the New Jersey State Planning Commission prepared the New Jersey State Development and Redevelopment Plan, "Communities of Place." That plan stressed smart growth throughout the state and designated the land along Route 35 and Kings Highway East in Middletown as a future regional center for dense, mixed-use development.
At that time, Joseph J. Azzolina, Sr., and his family owned approximately eighty-five acres of property on Route 35 North and Kings Highway East in Middletown known as Lots 53-57, 59-68 and 69.01 in Block 825 on the Middletown Township Tax Map. The Azzolina family acquired this property over a period of many years between 1954 and 1993 in order to build a shopping center. Initially, the property was located in the M-1 (light industry) and B-2 (business) zones.
Joseph J. Azzolina, Sr., learned that the Planning Board was revising the Township's Master Plan and asked that all of his property be included in one business zone rather than two. This request triggered several meetings with municipal officials who communicated an interest in creating a planned development (PD) zone for a town center. The municipal officials wanted to apply the PD zone to about 200 acres and wanted only one developer for the entire zone. They advised Joseph J. Azzolina, Sr., that they would rezone his property as the PD zone and, if he acquired additional contiguous property up to 200 acres, they would include the additional property in the PD zone as well.
The following year the Planning Board amended Middletown's Master Plan and embraced the town-center concept advocated *6 by the State. It designated "one of the last and largest areas of contiguous developable land in the Township" along Route 35 as the PD zone, including the property owned by the Azzolina family. The Master Plan recommended that the Township Committee "consider the positive aspects that a Town Center could bring to the community." In 1994 the Township Committee adopted a zoning ordinance that followed the recommendations contained in the 1993 Master Plan, including a PD zone applicable to Azzolina's eighty-five acres along Route 35.
The Azzolina family, in accordance with the encouragement of the municipal officials, began to acquire additional property for a Town Center, relying on the municipality's representation that the additional property would be included in the PD zone. Between 1993 and 1999, they acquired another fifty to fifty-two contiguous acres. All of this property was transferred to Mountain Hill, which was initially owned by Joseph J. Azzolina, Jr., and his cousin Phil Scadutto, Mountain Hill II, supra, slip op. at 3.[3] However, by December 12, 2003, other Azzolina and Scadutto family members acquired an interest in Mountain Hill.[4] However, "[t]he balance of the tract, 50 acres, remained in the M-1. . . zone. No amendments to the PD zone were enacted by the Township Committee from 1994 through 2000." Mountain Hill I, supra, 353 N.J.Super. at 60, 801 A.2d 412.
In early 2000, Mountain Hill unveiled a concept plan for the Town Center to be located on all 137 acres and met with a number of Middletown officials, including the Chairperson of the Planning Board, to ascertain whether the property zoned M-1 would be rezoned PD as first indicated in 1993. Most of the officials reacted positively, although the Planning Board Chairperson at that time expressed that the project was too big.
About the time that Mountain Hill's concept plan was presented, Middletown commissioned T & M Associates to perform a traffic study of Route 35 and on May 3, 2000, T & M released its final "Route 35 Corridor Study." T & M analyzed the impact of Middletown's zone plan on traffic generation along Route 35 from the Holmdel border to Red Bank. It found the traffic conditions at the time of the study to be "generally acceptable although some approaches at a few intersections experience[d] lengthy delays." Because 300 acres along Route 35 "could be developed further for uses that would impact the peak traffic hours" and full development would "greatly exceed[] current roadway capacity," T & M recommended that "the permitted intensity of development" be substantially reduced while "maintaining the existing land use plan." Alternatively, T & M recommended "changing the land *7 use plan at key areas." Whichever alternative Middletown selected, T & M recommended that it calculate the future number of trips that would take place if all the envisioned development occurred and, if necessary, further revise the land use plan to arrive at uses that were consistent with the current highway capacity.[5]
After T & M issued its report, Mountain Hill sought a development permit, submitting plans to Anthony P. Mercantante, Township Planning Director. Because Mountain Hill's additional property had not been rezoned by the Township Committee, Mercantante found that use variances were required to expand the PD zone into the M-1 zone and to build residential dwellings in the M-1 zone. As a result, "[i]n September 2000, Mountain Hill filed an application with the Middletown Township Zoning Board seeking a use variance for the 50 acres still zoned industrial to allow Mountain Hill to develop a commercial/residential project on its entire 135 acre tract." Mountain Hill I, supra, 353 N.J.Super. at 60, 801 A.2d 412.
The application sought three minor use variances in the M-1 zone on a bifurcated application, but the application was not complete until January of 2002, primarily because Mayor Rosemary Peters asked Joseph J. Azzolina, Jr., "to do a road show [and] have town meetings to . . . explain what a Town Center was to the community." He spent all of 2001 educating the public on the Town Center concept, which proposed to "construct a mixed-use development that would include 1,700,000 square feet of retail and office space and over 400 residential units, including twenty-five affordable housing units." Mountain Hill II, supra, slip op. at 3-4. "The proposed development generated substantial interest among Middletown's officials and members of the public, many of whom opposed the proposal." Id. at 4. Indeed, there were proponents of, and opponents to, the developmentthe single most important political issue in Middletownincluding citizen-action and special-interest groups, and each had a substantial body of support.
Meanwhile, the Township Committee began to revise Middletown's Development Regulations. First, the Township Committee adopted Ordinance 2001-2617 by unanimous vote on February 20, 2001. Id. at 4-5. The ordinance added the following proviso to the definition of "open space" (the open-space ordinance):
Where open space is a requirement of a zone and is created as a result of a site plan, subdivision, conditional use or variance application, not more than 50% of the area set aside shall consist of wetlands, open bodies of water or water courses, sloped areas of 25% or greater, detention or retention basins, swales and other drainage structures.
[Id. at 5.]
This amendment affected about seventy percent of the land in Middletown, including the property owned by Mountain Hill.
One committeeperson who voted on the open-space ordinance, Rick Brodsky, Esq., "was a partner in the law firm of Ansell, Zaro, Grimm and Aaron, which had represented [Mountain Hill], [Mountain Hill's] principals, and persons related to [Mountain Hill's] principals, for over thirty years." Id. at 5-6. Mountain Hill made no objection to Brodsky's presence that day because he had assured "Azzolina that he would not participate in any matters regarding the PD Zone, and the governing body had instructed Brodsky not to participate in any issues regarding the PD *8 Zone." Id. at 6. Shortly after the adoption of this ordinance, the State reissued its development plan on March 1, 2001, and continued to advocate town center developments as a solution to suburban sprawl. That same day Mercantante submitted proposed modifications to the PD zone to the Planning Board for its consideration.[6]
"In March 2001, the Township Committee introduced Ordinance 2001-2632 which sought to amend and `down-zone' the existing PD zone, substantially reducing what Mountain Hill could build on its property. Mountain Hill filed a valid protest under N.J.S.A. 40:55D-63 objecting to the proposed zoning ordinance." Mountain Hill I, supra, 353 N.J.Super. at 60, 801 A.2d 412. Mercantante then submitted a revised PD-zone ordinance on March 21, 2001, to the Township Committee and on May 2, 2001, the Planning Board recommended changes to this ordinance. Mercantante communicated those changes to the Township Committee on May 7, 2001, and advised that the Planning Board found the proposed ordinance consistent with the Master Plan.
Public hearing on the ordinance was scheduled for May 21, 2001. The week before the hearing, Mountain Hill's attorney, Gary E. Fox, telephoned Middletown's attorney, Bernard Reilly, to formally object to the down-zone ordinance and to the involvement of Smith in the introduction of that ordinance and any further proceedings therein. In a confirmatory letter faxed on May 21, 2001, Fox advised that Smith's company, Attorneys Title Company, had done title work for a number of years for Mountain Hill, Azzolina Land Corp., and Joseph J. Azzolina, Jr. He informed Reilly that her company had been billed and paid for those services. He asserted that Smith should have been disqualified from the introduction of the ordinance and should be disqualified from participating in the May 21, 2001, proceeding and any further proceedings.
On May 24, 2001, Reilly issued an opinion letter to Smith that there was no basis for disqualification for an interest that was remote, minor, attenuated or nebulous. He recited his understanding that the title work for Joseph J. Azzolina, Jr., was completed in 1998, that the work for Mountain Hill and Azzolina Land Corp. began in early 2000 and that Smith referred this work to another title company in early October 2000. Thus, he opined that any conflict was minor and remote and did not create a disqualifying conflict. As a result of this opinion, Smith continued her participation in the adoption of the down-zone ordinance, including the June 4, 2001, meeting.
At the June 4, 2001 Township meeting, the proposed ordinance was discussed. One of the members recused himself because of a conflict of interest. During the meeting, one of the four remaining members stated that "[f]or anything to pass here, it's going to require all four of us. All right. Just understand that. Anyone of us can block this whole ordinance." The Township's attorney did not comment on this statement. The ordinance was ultimately rejected by the Township Committee.

*9 On June 18, 2001, the Township Committee proposed Ordinance 2001-2644, which also sought to "down-zone" the PD zone. Mountain Hill again filed a valid protest under N.J.S.A. 40:55D-63 objecting to the proposed ordinance. At the public hearing on July 2, 2001, the Township's attorney announced that one of the five committee members present, Mr. Brodsky, had "recused himself with regard to this matter, as he has in the past. . . ." He then advised the Township Committee that "if a member has recused themselves, they are, in essence, resigned from the Committee for purposes of this application which means that effectively there are four, all the members of [the] governing body are four." Accordingly, he concluded that three affirmative votes [were] needed to carry the ordinance under N.J.S.A. 40:55D-63. Following that discussion the vote was taken, with three votes in the affirmative and one vote in the negative, and the ordinance declared adopted.
[Id. at 60-61, 801 A.2d 412.]
As with the open-space ordinance, Mountain Hill challenged the adoption of Ordinance 2001-2644 "down zoning" the PD zone (the down-zone ordinance). On December 11, 2001, Judge Florence R. Peskoe struck down this ordinance on the ground that four favorable votes were required in the face of a protest, not three. Mountain Hill I, supra, 353 N.J.Super. at 61, 801 A.2d 412. Middletown appealed and we held that N.J.S.A. 40:55D-63 requires that whenever there is a duly filed notice of protest, an ordinance must be passed by two-thirds of all of the members of a municipal body, even though one or more do not vote on a particular municipal ordinance. Id. at 65, 801 A.2d 412. Because the Township Committee is comprised of five members, we held that the protested down-zone ordinance could only be adopted by four affirmative votes, not three as Reilly advised, and affirmed the order vacating the July 2, 2001, ordinance. Id. at 66, 801 A.2d 412. Thus, by the end of 2001 the legal impediments to Mountain Hill's Town Center development had all been removed by the Law Division.
On March 11, 2002, Mercantante advised the Zoning Board that he had received an application from Mountain Hill for a use variance for about forty-two acres on each side of Kanes Lane in the M-1 zone adjoining the PD zone. He explained that this property was within the planned development boundary of the Master Plan. However, he observed that the Development Regulations did not follow the Master Plan boundary. He then pointed out some additional information the Zoning Board might wish to request.
Mountain Hill secured a traffic impact analysis and otherwise completed its application to the Zoning Board in July 2002. By that time, Mountain Hill sought to develop Lots 53-57, 59-73, and 75-81 in Block 825 and Lot 7.01 in Block 871 on the tax map of Middletown, totaling 137 acres. Mountain Hill IV, supra, at 218, 958 A.2d at 46.
The project had some proposed nonconforming uses in fifty-six acres of Mountain Hill's property located in the M-1. . . zone, which does not permit residential uses, supermarkets or department stores. The balance of its property, eighty-five acres, is located in the PD. . . zone, which permits town centers and mixed uses.
Mountain Hill sought a bifurcated use variance to permit construction of four single-family homes and four apartments in the M-1 zone as part of the overall development project. Mountain Hill also sought a bifurcated use variance to permit a portion of a department *10 store in the PD zone to extend into the M-1 zone. Public hearings on Mountain Hill's application were held on sixteen occasions from March 21, 2002, to May 22, 2003. In addition to other witnesses, Mountain Hill presented the testimony and report of Henry J. Ney regarding the traffic impact of the proposed application, which he compared with the traffic impact of a purported as-of-right plan. . . . Ney concluded that the proposed plan would have less impact than the as-of-right plan.
At a hearing on October 15, 2002, the Zoning Board addressed an issue that arose at earlier hearings respecting the as-of-right plan on which Ney relied. The Zoning Board previously determined that the reliability of Ney's opinion respecting the traffic impact of the proposed development depended on the accuracy of his assumption that the purported as-of-right plan conformed to the Development Regulations. There were two areas of concern addressed at the October 15, 2002, meeting: the accuracy of Mountain Hill's calculation of the floor-area ratios for each zone, which excluded a multi-story garage from gross floor area, and the inclusion of four storm-water retention basins in the calculation of the open-space ratios. The retention basins would be graded out of the existing property with a clay layer installed to assist in preserving the wet nature of the basins. The basins would be filled with natural surface-water runoff and would be covered with topsoil and grass before being filled with water. If the runoff was insufficient to keep the basins filled, the water level would be maintained through supplemental piping. The design of the basins would be graduated with a ledge for safety purposes. Each basin would have a fountain to discourage algae growth. From the surface of the land, a person would only see water, grass and the fountain and could not see any of the pipes or other drainage structures.
[Id. at 218-19, 958 A.2d at 46-47.]
The Zoning Board voted on the interpretations to be given to these definitions on October 15, 2002. Id. at 222-23, 958 A.2d at 49-50. It concluded that garages must be included in gross floor area and that retention basins could not be included in open space, ibid., despite the December 11, 2001, invalidation of the open-space ordinance, which expressly exclude retention basins from open space. Mountain Hill II, supra, slip op. at 2. Ultimately, the Zoning Board on June 23, 2003, adopted a resolution denying Mountain Hill's 2000 application because it essentially sought rezoning and variances were required for gross floor area and open space.
Mountain Hill once again turned to the Law Division for relief in a prerogative-writ action filed on June 27, 2003. Mountain Hill, L.L.C. v. Middletown Twp. Zoning Bd. of Adjustment, Docket No. L-2811-03. Two years later the judge reversed the interpretation of open space on May 23, 2005, Mountain Hill IV, supra, at 229-30, 958 A.2d at 53-54. We ultimately affirmed the judge's open-space decision, id. at 242-43, 958 A.2d at 62, but we also reversed the Zoning Board's interpretation of gross floor area, which had been affirmed by the judge. Id. at 236-40, 958 A.2d at 58-60. We concluded that commercial vertical parking garages should be excluded from gross floor area when calculating the floor-area ratio for Mountain Hill's property in the PD and M-1 zones and concluded that retention basins should be included in open space. Id. at 239, 242-43, 958 A.2d at 60, 62. Thus, no such use variances were required for the 2000 application, contrary to the *11 Zoning Board's June 23, 2003, resolution. Id. at 243, 958 A.2d at 62.
Sometime after the Zoning Board voted at the October 15, 2002, hearing, Mountain Hill concluded that the Zoning Board would not grant any variance to it and Mountain Hill decided to develop an as-of-right plan to submit to the Planning Board. Fully engineered, as-of-right plan drawings dated December 23, 2002,[[7]] were submitted to Mercantante with an Application for Development Permit on January 3, 2003, which also sought a consolidation subdivision into one lot. The transmittal letter asked Mercantante to deny the development permit and promptly refer it to the Planning Board.[[8]] By letter of January 16, 2003, Marianne Hanko, the Township Zoning Officer, denied the application on the ground that a variance pursuant to N.J.S.A. 40:55D-70(d) was required because inclusion of the vertical parking garage in gross floor area caused the plan to exceed the maximum floor-area ratio permitted in the PD and M-1 zones. Hanko also observed that the inclusion of retention basins in the percentage calculation of open space had already been determined by the Zoning Board. This denial was supported by an opinion letter from the Township Attorney, opining in part that a consolidation subdivision into one split-zoned lot was not permitted in order to avoid the zone setbacks.
[Id. at 225-26, 958 A.2d at 51-52.]
Once again, Mountain Hill turned to the Law Division and filed a prerogative-writ action against Hanko contesting her January 16, 2003, determination.[9]
While Mountain Hill was vigorously pursuing a development permit, the Planning Board, at the request of Mayor Rosemarie Peters, prepared a Draft Master Plan in January 2003. Smith was not a member of the Board in 2003. This Draft Master Plan rejected the State's concept of town centers to avoid suburban sprawl and instead suggested that "[t]he character of Middletown should be preserved by reinforcing the character of the Township Villages." The Draft Master Plan proposed to rezone the PD zone and a portion of the adjoining M-1 zone for development of active adult housing for persons over the age of fifty-five with some included commercial space.
No doubt this plan fueled Mountain Hill's zeal to push its development plan through in some way. Mountain Hill once again filed a prerogative-writ complaint in February of 2003. Mountain Hill, L.L.C., v. Middletown Twp. Planning Bd., Docket No. L-1293-03. The complaint alleged that four members of the Planning Board had conflicts of interest that should have precluded their participation in drafting the January 2003 Master Plan. That action was resolved on July 14, 2004, when the judge vacated the 2003 Master Plan based on the proven conflicts of interest by four Planning Board members other than Smith, who was not on the Planning Board in 2003.
With the action against Hanko dismissed at the pleading stage, and not wanting to "return to the Zoning Board on the same *12 issues it had already considered with respect to the September 19, 2000, application," Mountain Hill IV, supra, at 226, 958 A.2d at 51, Mountain Hill obtained a "second as-of-right plan to conform to the Zoning Board's erroneous interpretations of `gross floor area' and `open space.'" Ibid.
The revised, fully engineered drawings dated July 2, 2003, included parking garages in gross floor area, excluded retention basins from open space and eliminated the proposed theatre and hockey rink. Mountain Hill submitted the second as-of-right plan[[10]] and an Application for a Development Permit to Mercantante on July 29, 2003. Mountain Hill again requested that Mercantante deny the application and promptly submit it to the Planning Board, expressing concern that some of the parking spaces might require a design waiver and noting that this was Mountain Hill's third application and not an amendment of any prior application.
. . . .
Rather than submit [it] to the Planning Board, on August 12, 2003, Hanko again denied the development permit asserting that a(d) variance was required for the driveways providing access between the PD and M-1 zones, a(c) variance was required for buildings not sufficiently set back from the zone line boundary of the PD and M-1 zones and a possible (c) or (d) variance might be required with respect to the reconfigured open space in each zone. This denial was again supported by an opinion letter from the Township Attorney.
[Id. at 226-28, 958 A.2d at 51-52.][11]
On August 15, 2003, Mountain Hill wrote to Hanko and requested a meeting to clarify the issues raised by Hanko and Reilly and to alert them that Mountain Hill was in the process of eliminating the residential uses in the cross-zone building. Id. at 227, 958 A.2d at 52. In accordance with that letter, on August 27, 2003, Mountain Hill filed an amended application for development permit and an amended second as-of-right plan, seeking a consolidation subdivision and eliminating the second and third residential levels in the cross-zone buildings.[12]Ibid.
On September 11, 2003, Joseph Kachinsky for Hanko advised Mountain Hill, based on a opinion letter from Reilly, that the August 27, 2003, amended second as-of-right application required a(d) variance for driveways, parking and accessory facilities in the M-1 zone servicing or accessory to the PD zone; a(c) variance for structures not having the required setback from the M-1 property/boundary line; and such other variances as would be determined by a completeness review. That letter was accompanied by a September 11, 2003, letter from Reilly, who cited *13 certain case law as requiring setbacks or buffers along the zone line. He also relied on Section 16-9.23 of the Development Regulations as requiring setbacks in the M-1 zone because there was a "serious issue" about whether the lot lines could or would be eliminated. Accordingly, he opined that the amended second as-of-right plan required Mountain Hill to apply for (c) and (d) variances. On September 12, 2003, Hanko issued an amended denial of the August 27, 2003, application based on driveways, parking facilities and building structures.
As a result of this denial, on September 17, 2003, Mountain Hill filed an appeal with the Zoning Board on October 10, 2003, and sought an interpretation of certain issues. In all, Mountain Hill presented five questions, three for interpretation and two on appeal. Id. at 228-29, 958 A.2d at 52-53. However, Mountain Hill began to prepare a third as-of-right plan to remediate the grounds for denial in order to get before the Planning Board. Id. at 228, 958 A.2d at 53.
On October 16, 2003, Mountain Hill again wrote to Mercantante and applied for another development permit and requested transmittal to the Planning Board for site plan approval. He noted "[t]his is the fourth separate and distinct Application" that "Mountain Hill has made to develop this property." The third as-of-right plan submitted with the fourth application had no cross-zone buildings and no cross-zone driveways and proposed construction of only 1,188,408 square feet of space, which was seventy-six percent of the original proposal. Mountain Hill claims that it is totally conforming to all development regulations as interpreted by the Zoning Board and Mercantante.
With the third as-of-right application soon to be referred to the Planning Board for site-plan approval, it instituted an action by verified complaint in lieu of prerogative writ on October 31, 2003, under Docket No. L-5008-03 against Mountain Hill and secured an order to show cause returnable on November 18, 2003. The Planning Board alleged that Mountain Hill had three applications pending at the municipal level, one of which was before the Zoning Board. The Planning Board also alleged that Mountain Hill had two pending prerogative-writ actions, one challenging the Zoning Board's denial of the use variances sought in September of 2000 under Docket No. L-2811-03 (Mountain Hill IV) and another seeking a default approval for the failure to act on one application under Docket No. L-4131-03. Also pending was the action seeking invalidation of the 2003 Master Plan based on a conflict of interest among members of the Planning Board, under Docket No. L-1293-03, and the OPMA action in the Chancery Division under Docket No. C-316-03 (Mountain Hill III). In addition, the verified complaint alleged the pendency of the Mount Laurel litigation against Middletown and the Planning Board under Docket No. L-2810-03 and another suit filed by forty individuals in the Chancery Division, including two principals of Mountain Hill.
The verified complaint alleged violations of Rule 4:5-1(b)(2) and sought compliance with that rule, sanctions for violations of it, and an order "barring hearing of any pending applications before the [Zoning Board] and/or the [Planning Board]" and "restraining [Mountain Hill] from instituting any further Civil Actions without prior approval of this Court."
While the hearing on the Planning Board's Order to Show Cause was pending, Reilly on November 3, 2003, advised Hanko about the Planning Board's lawsuit and stated: "Pending . . . the outcome of that proceeding, it would appear to be improvident to proceed formally with this *14 more recent [October 16, 2003] submission pending the Court's ruling on the pending Order to Show Cause." Reilly enclosed a draft letter for Hanko to issue by November 5, 2003, and recommended attaching his letter to it.
On November 5, 2003, Lawrence A. Carton, the attorney for the Planning Board, served the Verified Complaint and Order to Show Cause in Docket No. L-5008-03 by hand on Fox. Fox immediately wrote to the judge raising a number of procedural issues and presenting some scheduling concerns, as well as alerting the judge to Mountain Hill's efforts to file a totally conforming as-of-right plan.
Also on November 5, 2003, Hanko checked off "DEVELOPMENT PERMIT APPROVED" on the fourth Application for Development Permit respecting the third as-of-right plans. That approval was conditioned on an attached letter dated November 5, 2003, from Hanko. Although the letter has "DENIAL OF DEVELOPMENT PERMIT" above the date, that designation is inconsistent with the body of the letter. Hanko advised Fox as follows:
With the assistance of the Township Attorney and the Township Planner's office, please be advised of the following:
1. The issue in the previous submissions as to the merger of the PD and M1 zoned areas appears to have been addressed by the separation or division of the development with no cross connections. The detail as to the physical construction of that separation or division is not clear. However, assuming that it is confirmed that the PD and M1 zoned areas are adequately and properly divided and separated, a "d" variance would not be required. The manner and detail of the division and separation, and its compliance with zoning requirements will be reviewed further during completeness review.
2. Certain of the parking areas and/or drive/accessways may require design waivers and/or "c" variances. The exact determination of the design waivers or "c" variances required will be further reviewed in the completeness review.
3. As noted in earlier review letters, preliminary and final site plan approval is required.
4. Further variances may be determined as necessary upon further review during completeness determination or by the Board during the hearing process on the application.
Enclosed is a copy of a letter from Township Attorney . . . regarding legal issues relevant to this application. As noted therein, he advises there is a pending lawsuit and issue as to whether jurisdiction for this submission/application can proceed given the multi-submissions and various lawsuits regarding the property now pending. That determination will be made by the Court in due course. If you have any further questions in that area, please direct them to [him].
These two letters were apparently received by Fox on November 5, 2003, because he responded to Reilly that day, construing his November 3, 2003, letter and Hanko's November 5, 2003, letter as a denial of the application with a referral to the Planning Board for a forty-five-day completeness review. Fox also disputed the instruction not to act because no stay was in place as of November 5, 2003.
On November 7, 2003, the Zoning Board moved to intervene in the Planning Board's action and on November 12, 2003, Middletown also moved to intervene. Then on November 17, 2003, Mountain Hill moved to dismiss the Planning Board's *15 action. The Order to Show Cause was heard on November 18, 2003. The parties argued the application extensively and the judge reserved decision and issued a written opinion on November 25, 2003.[13]
The judge concluded that the action before him was not cognizable because a prerogative-writ action is "reserved for review of governmental action only," citing Alexander's Department Stores of New Jersey v. Borough of Paramus, 125 N.J. 100, 592 A.2d 1168 (1991). He denied the motions to intervene and dismissed the action. Nonetheless, he addressed one issue, that "Mountain Hill, L.L.C. has inundated both the Planning and Zoning Boards . . . with numerous applications on the same parcel for development . . ., while at the same time maintaining multiple appeals within the Superior Court of previous determinations of both boards." The judge concluded as a matter of law that the municipal boards were divested of jurisdiction by the filing of the Superior Court actions. He granted the Planning Board's application and provided that "Mountain Hill, L.L.C. is hereby enjoined from bringing any applications to either the Planning Board or the Zoning Board. . . regarding the development of the `Town Center' project, until such time as disposition or withdrawal of each pending appeal has been made." Middletown, although it was not a party, was to submit a form of order. The opinion was released to the parties on December 2, 2003.
Mountain Hill contends under the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, that the thirty-five-day review period allowed to the Planning Board had ended on November 30, 2003, before the opinion was distributed. N.J.S.A. 40:55D-26; see also Middletown Twp., N.J. Middletown Zoning Ordinance, § 16-4.4. On December 1, 2003, the Planning Board secretary wrote to Fox advising that the fourth application had been received for processing. She attached a copy of the fees that were required to be paid before the plans could be forwarded for a completeness review by the Planning Board Engineer. She required proof that the taxes had been paid and sought additional copies of various documents and a disclosure of interested owners. She stated that the application would be deemed incomplete until all items were received, including the items on the attached completeness checklist, and the application had been found satisfactory by the Planning Board Engineer. Thus, the Planning Board itself had received the fourth application from the Zoning Officer.
In the meantime, the Zoning Board was proceeding with Mountain Hill's appeal to it relating to the third application. On December 3, 2003, Mountain Hill submitted a letter brief to the Zoning Board and its attorney, Gregory W. Vella, respecting the five questions.
After receiving the judge's opinion, Fox requested a telephone conference with the judge and the other attorneys, which took place on December 5, 2003. He argued that the appeal and application for interpretation filed on October 10, 2003, with the Zoning Board respecting the fourth application, as amended in August, should proceed. The judge concluded after hearing argument from Reilly and Vella that "I did [not] want any new filings . . . [b]ut if anything is still proceeding, that issue should go ahead and continue." Fox agreed there would be "no new filings." On December 11, 2003, Fox wrote to Vella *16 expressing his understanding from the transcript of the telephonic conference that only new filings were prohibited and that there were only two matters pending as of that time, the appeal and interpretation issues before the Zoning Board and the as-of-right plan and application submitted on October 16, 2003, that was deemed incomplete on December 1, 2003. He expressed that Mountain Hill was in the process of submitting the items requested on December 1, 2003, and expected that the Planning Board would timely schedule and decide the issues presented by the application.
On December 12, 2003, Mountain Hill supplied the additional items requested by the Planning Board secretary for the fourth application, commenting that the enclosures "should make the above Application immediately complete," but the Planning Board had been instructed by Carton not to accept anything from Mountain Hill. Fox wrote that day to Carton, complaining of his instructions to Mercantante and arguing that the judge clearly stated on December 5, 2003, that he only wanted to prohibit "new filings." This triggered a written dispute among the parties over the form of order submitted by Vella that was then resolved by the judge.
The order reflecting the judge's November 25, 2003, opinion was entered on December 18, 2003. The judge dismissed the Planning Board's complaint, denied the motions to intervene, and discharged the Order to Show Cause as improvidently entered. The judge also enjoined Mountain Hill "from filing any new applications to either the Planning Board or the Zoning Board . . . without leave from this Court." The judge defined the term "new application" as meaning "any application that was [not][14] perfected as of December 2, 2003, the date of distribution of the above-captioned Opinion."[15] This brought review of Mountain Hill's fourth application to a halt.
In the meantime, on December 15, 2003, Township Committeeman Brodsky resigned from his position and, in compliance with the Municipal Vacancy Law, the Committee appointed Thomas Hall to Brodsky's unexpired term on January 7, 2004. By that time, Smith was again the mayor of Middletown.[16] The appointment of Hall resolved the logjam the Township Committee faced in amending the zoning plan because it had only three votes that it could muster to adopt any new zoning ordinances affecting Mountain Hill's property. Mountain Hill I, supra, 353 N.J.Super. at 61, 801 A.2d 412.
With Brodsky eliminated from the Township Committee and Mountain Hill enjoined from prosecuting its final application to the Planning Board, Mercantante by memorandum dated January 29, 2004, submitted a draft proposal for an ordinance to Smith and the Township Committee that would rezone the PD zone and some of the M-1 zone into an AAC zone. He stated:
Pursuant to the 2003 Master Plan this zone would apply to the current Planned Development (PD) zone. As you will recall the Master Plan was prepared by *17 Heyer and Gruel in 2002 and was adopted by the Planning Board in January 2003. The Board also had Heyer and Gruel prepare a draft ordinance for an active adult residential use. The attached ordinance is largely based on that draft.
He ended the memorandum by stating that it was his "understanding that this matter will be on the agenda for discussion at your meeting of February 2nd, 2004."
On February 27, 2004, Mercantante transmitted a revised AAC ordinance to the Township Committee, stating that the Planning Board, which included Smith as the mayor, had suggested some changes to the ordinance at its meeting the night before and voted unanimously to forward the revised ordinance to the Township Committee. Mercantante indicated that he would attend the Committee workshop meeting on March 1, 2004, when the ordinance would be discussed.
On March 1, 2004, the AAC proposal was discussed by the Township Committee at a "workshop meeting." At that meeting, Mercantante made comments regarding the proposed AAC ordinance and responded to questions from Committee members. Member O'Grady commented that the proposed ordinance "would cause the township to lose out on another commercial tax ratable." He also pointed out that the cost of services for garbage, snow, and leaf and yard removal would place another drain on the budget whereas a commercial development would provide all of those services and generate tax revenue. Members Peters and Parkinson commented that, if the zone remained commercial, traffic on Route 35 would become unbearable. The minutes reflect that the proposed ordinance would be placed on the agenda for March 15, 2004.
On March 15, 2004, the AAC ordinance was introduced to the Planning Board and on March 19, 2004, Middletown issued a notice of public hearing on AAC ordinance. The notice indicated that the new AAC zone would replace the PD zone entirely, would rezone six acres in the M-1 zone, and would be consistent with the 2003 Master Plan. "The new zone will permit the development of an `Active Adult' age restricted community."
On a track parallel to the Township Committee's efforts to amend the Development Regulations, the Zoning Board adopted a resolution on March 22, 2004, determining each of the five issues raised by Mountain Hill. Mountain Hill IV, supra, at 228, 958 A.2d at 53. Two issues were rejected as hypothetical and three issues were decided adversely to Mountain Hill.[17]
A special meeting was held on or about March 29, 2004, at which the Planning Board reviewed the proposed ordinance to determine whether it was consistent with the 2003 Master Plan. Mercantante presented the ordinance and explained that the Township Committee had asked the Planning Board to form a subcommittee to consider the concept of an AAC zone and that the subcommittee had met on multiple occasions and developed the proposed ordinance. He explained the salient points of the ordinance to the Planning Board and stated that it had thirty-five days to report to the Township Committee whether the ordinance conformed to the 2003 Master Plan. Mercantante pointed out that the 2003 Master Plan recommended *18 that the PD zone be rezoned to an AAC zone. Specific provisions of the ordinance were discussed by Planning Board members.
Peters, a Board member, commented
since we're aware that the master plan is being challenged and that the decision hasn't come down yet, the ordinance is written in such a way that it references a resolution that we'll be attaching, which is kind of an alternative to the assumption that what we're doing is consistent with the master plan. If the master plan is thrown out, we're thinking that it will kick in a requirement that we attach a resolution stating reasons why it isn't consistent with the master plan. That's a requirement for any ordinance that isn't consistent with the master plan, that the governing body has to state reasons in their resolution as to why we think this is a good thing, even though it isn't consistent with the master plan. So the language in the ordinance says, first of all, that it's consistent with the master plan, but if it should be decided that the master plan is not in effect, we still think it's a good thing for these reasons and the township attorney will be drafting a resolution stating those reasons.
Mercantante advised the Planning Board that the Township Committee would consider the ordinance on April 7, 2004. It was noted for the record that no members of the public were present because the meeting was not a hearing. A member of the Board moved "that we recommend to the Township Committee that they adopt this ordinance and that we find it totally in keeping with the 2003 master plan." The motion was passed unanimously although Smith was not in attendance and, thus, did not vote.
On April 2, 2004, Mountain Hill submitted an Amended Order to Show Cause in the Planning Board's dismissed action under Docket No. L-5008-03 respecting the AAC ordinance. Mountain Hill averred that by December 12, 2003, it had satisfied all of the incomplete items on its October 16, 2003, application and that it should have received its as-of-right approval no later than March 16, 2004. Mountain Hill's counsel related the failed settlement efforts, which were caused by Middletown's refusal to discuss any settlement. Instead, he advised the court that Middletown was taking advantage of the stay to rezone the property. Mountain Hill sought an order restraining Middletown from proceeding with consideration of the AAC ordinance. On April 5, 2004, the judge advised Mountain Hill that the action under Docket No. L-5008-03 had been dismissed. The judge stated that Mountain Hill's proposed Order to Show Cause must be submitted with a new complaint.
The following day, Mountain Hill's counsel sent a Notice of Protest to the Township Committee pursuant to the MLUL respecting the AAC ordinance, triggering the requirement for four favorable votes in order to adopt the ordinance. He also reiterated Mountain Hill's 2001 position that Smith had a nonwaivable conflict of interest and could not participate in the hearing or vote on the ordinance. He also contended on behalf of Mountain Hill that
this Ordinance is political retribution, not planning. I know that you will say that this . . . is not the case, however, there is not a soul on either side of this issue (and there are many people on both sides) that believes that this is not a payback for what you consider to be a political faux pas by my client, or members of their family for daring to exercise their constitutional right of free speech and in doing so to make the unforgivable error of criticizing several members of this Body and even worse, your political boss. For that unforgivable *19 mistake, we are now faced with this Ordinance, as our punishment. The sad thing is, the effect of this punishment will be felt by the entire Township, not just my client. Your actions will result in more litigation which will go on for years and none of you will be here as members of Body when that litigation ends. But you will be responsible for it.
On April 7, 2004, the public hearing concerning the AAC ordinance was held by the Township Committee. Mercantante presented the ordinance and began by stating:
We all know there's been a substantial amount of public interest in this development. There's a lot of litigation involving multiple issues involving the property. Besides, you know, the fighting and the litigation, what's been happening is that over the past prior year, in 2003, the Planning Board adopted a new Master Plan.
He then described the AAC ordinance and Mountain Hill's property.
Thereafter, Reilly discussed the letter from Fox and advised Smith that it was his opinion that there was no conflict precluding her participation. Michael D. Schottland on behalf of Mountain Hill then presented its objections to the rezoning of its property. Among other concerns, he stated that "[t]he question here is whether or not a political organization such as the Township Committee ought to, when it's dealing with one property owner in the context of what has occurred, how you're going to develop that property or let it sit vacant." He pointed out that between 2000 and 2003 Mountain Hill had reduced the size of its project repeatedly in response to input from the Township Committee and the Zoning Board. Schottland discussed the fruitless settlement efforts Mountain Hill had undertaken, which were ignored by the Township Committee, and invited the Township Committee to participate in settlement discussions and take no action that day.
The meeting was then opened for public comment, after which a motion was made to close the public hearing and adopt the ordinance. The ordinance was adopted by a vote of four to one, O'Grady placing his objections on the record. Smith voted in favor of the AAC ordinance. A six-page resolution providing a detailed explanation of the Township Committee's reasons for its adoption was signed by Smith and the Acting Clerk on April 7, 2004.
On June 16, 2004, Mountain Hill amended its verified complaint in lieu of prerogative writs under Docket No. L-2378-04 challenging the AAC ordinance.[18] The first count of the amended complaint alleged that the ordinance was invalid for a number of reasons. First, Mountain Hill alleged that Mayor Smith had a nonwaivable conflict of interest. Second, "[t]he Notice to the Public stated the ordinance was consistent with the 2003 Master Plan" but that plan was under attack and would probably be voided by the court, making the notice defective and deceptive. Third, the ordinance was not consistent with the 1994 Master Plan and "neither the Township Committee nor the Planning Board identified the inconsistencies that exist between the ordinance and the 1994 Master Plan." Fourth, the ordinance restricted all use of the plaintiff's property to "active adult housing," violating Mountain Hill's rights to equal protection and substantive due process. Fifth, the ordinance required *20 a Mt. Laurel "set aside" that was inconsistent with Middletown's Affordable Housing Plan and violated the Rules and Regulations of the Council on Affordable Housing (COAH). Sixth, the ordinance violated the MLUL and, last, it constituted impermissible spot zoning.
In the second count Mountain Hill addressed the injunction entered against it and the events subsequent thereto and alleged that the Township Committee had taken illegal and improper advantage of the judge's ruling. It recited the adoption of the ordinance eliminating the Town Center and asserted that the Township Committee and Planning Board should have advised the court of their intent. As relief, it sought resolution of all the pending litigation and a remand to the Planning Board for consideration of the fourth as-of-right plan. Mountain Hill sought an injunction barring any further amendments to the zoning on its property and an order vacating the injunction entered against it.
On July 14, 2004, the judge issued an opinion under Docket No. L-1293-03, in which Mountain Hill challenged the January 2003 Master Plan on the ground that four members of the Planning Board had an impermissible conflicts of interest. The judge found that "[m]embers of the Riverside Drive Association, a not-for-profit association designed to `maintain the nature of the Navesink River Road Community,' appeared at every public meeting and, through counsel, vehemently objected to the development of a Town Center." He also found that
from June 2002 to February 2003, the Planning Board re-examined [sic] the 1993 Master Plan pursuant to N.J.S.A. 40:55d-89, which requires that a general review of the Master Plan be conducted at least every six years. During this period four voting members of the Planning Board, or their immediate family, were also allegedly members of the Riverside Drive Association. . . .
After thoroughly reviewing applicable case law, the judge concluded that "dual affiliation with the Planning Board and Riverside [Drive] Association was improper." He observed that those four members "were able to effectively wield their authority by changing the Master Plan. A change to the Master Plan, in turn, nullified the application before the Zoning Board because it no longer conformed to Middletown's objective." The judge rescinded the 2003 Master Plan and required that any amendments to the 1994 Master Plan required "repeating the process from the beginning in accordance with the MLUL at which point the Planning Board may revote on the revision of the Master Plan or leave the Master Plan intact." The judge entered an order on July 30, 2004, which declared the 2003 Master Plan void ab initio and barred the four Planning Board members from participating in any future master plan affecting the Mountain Hill property.
In October 2004 the Planning Board quickly prepared another Master Plan. The Board focused on enhancing and reinvigorating Middletown's historical pattern of villages and neighborhoods. It included eighty-seven acres of Mountain Hill's property in an AAC zone, which allowed a limited amount of commercial development. The Board stated:
The Planning Board has considered the issue of maintaining the 1993 Master Plan recommendation for the establishment of a Planned Development district and a possible Town Center Development. The Board has concluded that although such a concept was determined to be an appropriate idea at the time of the prior Master Plan, it now no longer is. Recognizing that mixed use "Center" type development is a concept promoted *21 by the State of New Jersey and others and that such development techniques are laudable in some instances, the Board feels that the area proposed for such use in Middletown is no longer appropriate for such a large and intense development, given limited and complex road access issues, overall traffic issues and environmental factors, including the new State Stormwater [sic] Management regulations.
The board therefore recommends that the zoning limiting the site to an Active Adult use, including the option for a mixed use Active Adult use is more appropriate and should be retained.
On November 12, 2004, Mercantante sent a memorandum to Smith and the Township Committee reporting that the Planning Board had determined that there should be a completely new master plan, that staff had prepared such a plan, and that it had been adopted by the reconstituted Planning Board on October 27, 2004. He recommended readoption of all zoning ordinances adopted after the 2003 Master Plan, including the AAC ordinance No. 2004-2760. He suggested that the ordinances be introduced on November 15 with a public hearing scheduled for December 6, 2004.
On November 23, 2004, Mercantante reported to Smith and the Township Committee that on November 22, 2004, the Planning Board reviewed all twelve introduced ordinances, including the AAC ordinance, found them consistent with the October 2004 Master Plan and recommended readoption of all twelve to "preclude any potential effort to attack them via a legal technicality in the future." Mercantante also recommended that the December 6, 2004, public hearings address the ordinances in the order in which they were adopted to ensure continuity and avoid possible conflicts.
On December 6, 2004, Mountain Hill submitted an Order to Show Cause under Docket No. L-2378-04 seeking to restrain the Township Committee from taking any action to rezone Mountain Hill's property. In a letter brief to the judge, Fox argued that Middletown and Planning Board improperly stalled Mountain Hill's application from January 2003 to December 2003, at which point, he contended, Mercantante and Reilly finally acknowledged that the filed plans were as-of-right. Fox stated that it was only then that the Planning Board, Zoning Board, and Township Committee sought an injunction barring Mountain Hill from proceeding. He also described the 2004 events relating to the AAC zoning effort and advised that the Township Committee proposed to readopt the AAC ordinance that evening, despite the scheduled December 21, 2004, trial on Mountain Hill's suit challenging the AAC ordinance. Fox did not raise Smith's conflict at this time. He sought a temporary restraining order and a hearing on a preliminary injunction.[19]
That evening Smith and the Township Committee adopted AAC Ordinance 2004-2798. The ordinance recited the invalidation of the 2003 Master Plan and the adoption of a "new comprehensive Master Plan" on November 27, 2004. It further recited that the AAC ordinance was being ratified and readopted to preclude and address certain legal concerns arising from the adoption of the 2003 Master Plan. Smith signed the readopted ordinance.

*22 II.
On December 14, 2004, Mountain Hill filed a prerogative-writ complaint against the Planning Board under Docket No. L-5591-04 challenging the October 27, 2004, master plan. The complaint alleged that the Planning "Board continued to be affected and tainted by the prior conflict of interest" and that the 2004 Master Plan was "based on faulty zoning, rather than being based on planning." As a consequence, Mountain Hill alleged that the Master Plan, including the proposal for its property, was improper, void, arbitrary, capricious and unreasonable. The verified complaint did not allege a conflict of interest issue respecting Smith.
On December 21, 2004, the judge entertained argument on Mountain Hill's application under Docket No. L-2378-04 for an order invalidating the first AAC ordinance; dissolving the December 15, 2003, stay imposed on Mountain Hill; and remanding Mountain Hill's as-of-right plan to the Planning Board for review under the 1994 ordinance. The issues were ultimately decided on March 14, 2005.
On January 10, 2005, the judge conducted a plenary hearing at which Mayor Smith testified about her business and the work she had done for Azzolina family members. She stated that she had been a member of the Township Committee for twelve years ending in 2004. She stated that she had owned Attorneys Land Title Agencies, Inc., since 1987 and had been a licensed title insurance agent since 1986. She wrote policies for three title insurance companies, Fidelity, Stewart and First American. Most of her work came from referrals from attorneys and she considers the attorneys and property owners or purchasers whom they represent as her clients. Her company does the title searches and issues a title commitment with a bill to the attorneys. After title closes, she looks at the documents submitted by the attorney and, once the documents have been recorded and liens on the title cleared, she issues the title policy. She then remits the premium to the title insurance company and puts her file into storage. Fidelity, Stewart, and First American do not become involved unless the purchase price exceeds her limit of $1,000,000.
Smith testified that she did not do conflict-of-interest examinations of her files when matters came before the Township Committee. She never felt she had to conduct a conflicts check because she did not feel that there was ever a conflict. With respect to Mountain Hill, Smith testified that the controversy over the development began in 2000 and the Township Committee began in 2001 to look at ordinances to amend the zoning ordinance applicable to Mountain Hill's property. Those ordinances in 2001 included an amendment to the definition of open space and to the outline of the PD zone. She knew at the time that Joseph J. Azzolina, Sr., was opposed to those ordinances and, before she voted on one of the ordinances, she knew that a conflict-of-interest issue had been raised. She knew that she had done the title work on the home of Joseph J. Azzolina, Jr., and that he became a member of Mountain Hill thereafter. She was very concerned about the conflict issue, but was advised by Reilly that she did not have a conflict. She then voted on the proposed ordinance.
Smith also had done the title work when Judith Azzolina purchased her home in 1998, although that was not raised in 2001 as a basis for the conflict of interest. When Judith Azzolina refinanced her property in 2004, her attorney referred the work to Smith's company. The loan transaction closed on November 29, 2003, and the policy issued in January 2004. Before *23 the AAC ordinance was adopted in April 2004, Fox raised the conflict issue again. However, he did not make reference to Judith Azzolina in his letter and Smith did not do a conflict check under the Azzolina name when the issue came up again in 2004. Had Fox brought Judith's refinance to her attention, it would have made a difference to her and she would have consulted with Reilly. She personally did not know in April 2004 that Judith was connected with Mountain Hill nor did she know in 2001 that Joseph J. Azzolina, Jr., was a member of Mountain Hill.
On cross-examination, Smith testified that she was asked to do some title work on the properties that Joseph J. Azzolina, Sr., was "gathering" and she ultimately withdrew from the work because she knew there was an objection to the development. She asked to be reimbursed for the costs she had incurred "because when you do your searches, you do a lot of State searches, upper court searches, municipal searches so it got to be a little pricey because there were two properties involved." When asked if she made a profit, she responded, "No profit, out of pocket definitely. I lost a lot on those files. They're very fat, take up a lot of room in the garage" where she stores closed files. The fee would have been $6000 had she not withdrawn before completing the work.
Smith testified on redirect that one of the Township Committee members was in favor of the development. She believed that it was important that she preserve her ability to vote because a supermajority was required to enact any ordinance affecting Mountain Hill's property if it submitted a notice of protest. However, she testified that this concern did not motivate her decision on the conflict issue. On questioning from the judge, Smith testified that her position as president of her company did not affect her vote on any matters dealing with Mountain Hill and she never thought that her relationship with Joseph Azzolina would affect her vote either.
On January 25, 2005, Mountain Hill filed another prerogative writ complaint against Middletown under Docket No. L-0296-05 challenging the readoption of the AAC zone. The complaint alleged that Mayor Smith had a nonwaivable conflict and the ordinance was based on the defective 2004 master plan and was not consistent with the 1994 master plan. The complaint also alleged that the AAC zone was unconstitutional and violated COAH rules and regulations and the MLUL. It also alleged that the AAC ordinance constituted impermissible spot zoning and was arbitrary, capricious and unreasonable. The complaint sought a judgment voiding the second AAC ordinance.
On March 14, 2005, the judge issued an opinion under Docket No. L-5008-03, the dismissed Planning Board case, and L-2378-04, the challenge to the first-adopted AAC ordinance, reciting that he had "consolidated" the court's own injunction in L-5008-03 with L-2378-04. In this opinion the judge "sua sponte" vacated the injunction, finding under Rule 4:50(f) that there were "truly exceptional circumstances warranting such relief." The judge noted that Mountain Hill's October 16, 2003, application was referred to the Planning Board but on December 1, 2003, the Planning Board notified Mountain Hill that it was incomplete. Mountain Hill completed the application on December 12, 2003, but the Planning Board did not process it. The judge decided that it was appropriate to relieve Mountain Hill from the injunction, which had been issued "as both a case management tool and a prophylactic measure" to "preserve judicial resources and promote judicial economy" and protect the volunteer boards against any undue hardship. *24 The judge observed that the only remaining appeal was L-2811-03, scheduled for trial in May 2005. Therefore "case management" was no longer justified. The judge also concluded that there was no present threat of undue hardship on the boards because there were "currently no applications before" the Zoning Board or Planning Board and the property had been rezoned. Because the injunction was being lifted, Mountain Hill could pursue its October 2003 application. As a result, the judge addressed the "time of decision rule," reviewed relevant case law and concluded that the issue should not be decided until the Planning Board had ruled on the pending application.
On March 17, 2005, the judge entered an order in L-5008-03 and L-2378-04 vacating the injunction and requiring the Planning Board to review the October 2003 application within sixty days and determine if Mountain Hill was entitled to approval on an "as-of-right" basis under the old PD/M-1 zone. The judge, however, retained jurisdiction over the applicability of the AAC ordinance to the October 16, 2003, application. The judge again "dismissed" the action under Docket No. L-5008-03.
A motion for reconsideration to stay the March 17, 2005, order was heard on April 11, 2005. After considering the arguments of the parties, the judge decided to stay compliance in order to permit him to decide the conflict issue involving Mayor Smith and three procedural issues respecting adoption of the AAC ordinance. If necessary there-after, the judge would address the time-of-decision issue.[20] An order to that effect was entered on May 2, 2005.
On April 15, 2005, the judge issued his opinion in L-2378-04, L-5591-04 and L-0296-05, all of which had been consolidated sua sponte by the judge due to overlapping issues. The judge concluded that Mayor Smith did not have a disqualifying conflict of interest. He also concluded that the notice respecting the first AAC ordinance was not defective, the failure of the Planning Board to adopt a resolution approving the AAC ordinance was not fatal to the ordinance adopted by the Township Committee as no more than the passage of a motion was required, and the MLUL does not require the Township Committee to consider the 1993 master plan in adopting a zoning ordinance.
The judge found as fact that Smith's title company was involved in at least four transactions involving property owned by two individual members of Mountain Hill, Joseph J. Azzolina, Jr., and Judith Azzolina, but their property was unrelated to the Mountain Hill project. He also found that "Smith testified before this court that in 2000, her company declined to complete title work on certain property located along Route 35 due to the public controversy surrounding Mountain Hill's Town Center." Nevertheless, he observed, Mountain Hill argued that the other title work precluded Smith from voting on the adoption of the AAC ordinance.
After discussing the legal standards for public-servant disqualification, the judge concluded that
Smith's interest in Attorneys Land Title does not disqualify her from voting on an ordinance that affects the property rights of Mountain Hill. Unlike the title company in Dover [Township Homeowners and Tenants Association v. *25 Township of Dover, 114 N.J.Super. 270, 276 A.2d 156 (App.Div.1971)], Attorneys Land Title has not performed any title work for Mountain Hill. Rather, the company has only done work for individual members of Mountain Hill. As such, the court finds that Smith's interest in Attorney[s] Land Title is more analogous to the "occasional" employment discussed in Petrick [v. Planning Board of the City of Jersey City, 287 N.J.Super. 325, 671 A.2d 140 (App.Div.1996)]. Furthermore, there is no evidence to suggest that Mountain Hill's proposed Town Center would enhance the business of Attorneys Land Title. In fact, Smith testified that her company declined to complete title work for certain property that was included in the Town Center project, which resulted in a loss to the company. Additionally, the record demonstrates that Smith voted in favor of the AAC Ordinance, which further undermines any favorable status that her company could obtain with Mountain Hill. Accordingly, the court finds that reasonable persons could not fairly conclude that Smith's interest in Attorney[s] Land [Title] was or even had the appearance of a disqualifying interest. See [id.] at 332, 671 A.2d 140.
In sum, Smith's ownership interest in a title . . . company that has not performed any title work for Mountain Hill, but has only conducted title work for two individual members of Mountain Hill regarding property unrelated to the Town Center project, is simply too remote and speculative to warrant a disqualification. To hold otherwise would unjustifiably deprive the Township of Middletown of the services of its duly elected or appointed officials. Van Itallie [v. Franklin Lakes,] 28 N.J. [258,] 269, 146 A.2d 111 [(1958)].
The judge then turned to the three procedural issues and first considered Mountain Hill's contention that the notice of the April 7, 2004, public hearing was defective because it stated that the AAC ordinance was consistent with the 2003 Master Plan whereas that master plan was subsequently invalidated. The judge rejected this contention, finding that the notice complied with the requirements of N.J.S.A. 40:49-2.1 and "provided an adequate `summary of the main objectives or provisions' of the proposed AAC ordinance."[21] He concluded that the subsequent invalidation of the 2003 Master Plan was inconsequential because the effectiveness of the notice is measured from the time the notice was published, when the 2003 Master Plan was still presumably valid. Thus, he concluded "that the Township Committee had proper jurisdiction to conduct its April 7, 2004 hearing."
Second, the judge addressed Mountain Hill's claim that the AAC ordinance was invalid because the Planning Board did not submit a written report to the Township Committee identifying any inconsistencies with the 2003 Master Plan, as required by the MLUL, N.J.S.A. 40:55D-26(a). The judge found that "on March 29, 2004, the Planning Board held a special meeting to review and discuss the ordinance." At that time, the Planning Board unanimously passed a motion stating that the ordinance was completely consistent with the 2003 Master Plan and recommended its adoption. However, it never issued a written report, nor memorialized its action in a resolution. The judge constructed that statutory provision as not expressly requiring a written report, especially when *26 compared to other MLUL provisions. Because it was undisputed that the Planning Board did review the ordinance and did find it entirely consistent with the 2003 Master Plan, the judge concluded that requiring a written report was exulting form over substance and did not warrant the invalidation of the AAC ordinance.
Third, the judge discussed Mountain Hill's argument that the AAC ordinance was invalid because the Planning Board never identified any inconsistencies with Middletown's 1994 Master Plan. The judge rejected this argument, finding that the Planning Board was not required to anticipate that its 2003 Master Plan would be invalidated. Additionally, the Township Committee adopted a "reasons resolution" to explain its departure from the 1993 Master Plan, which satisfied the requirements of Willoughby v. Planning Board of Township of Deptford, 326 N.J.Super. 158, 165, 740 A.2d 1097 (App.Div.1999), certif. denied, 165 N.J. 603, 762 A.2d 218 (2000). As a result, "although the 2003 Master Plan was subsequently overturned, the AAC ordinance still satisfied the requirements of N.J.S.A. 40:55D-26a and -62a."
On April 22, 2005, the judge entered an order in L-2378-04, L-5591-04 and L-0296-05 dismissing the procedural, conflict, and notice challenges to the first and second AAC ordinances. That order preserved for future determination the issues of whether the AAC ordinance was arbitrary or constituted impermissible spot zoning. This is the first of the orders from which Mountain Hill appeals in this case.
Subsequent to the decision on the conflict and procedural issues surrounding the AAC ordinance and after a motion for reconsideration, the judge entered an order on May 5, 2005, modifying its March 17, 2005, order vacating the injunction to have paragraph three read: "The Court affirms the Zoning Board [of] Adjustment[']s findings as to the setback requirements." Mountain Hill IV, supra, at 223, 958 A.2d at 49. On May 23, 2005, the judge reversed the Zoning Board's exclusion of retention basins from the calculation of open space but affirmed its inclusion of vertical parking garages in floor-area ratio. Id. at 229, 958 A.2d at 53.
On June 2, 2005, the judge conducted a pretrial conference and heard argument on the time-of-decision rule and the application of it to the Town Center development. The judge reserved decision and on July 20, 2005, he issued an opinion in L-5008-03 and L-2378-04. After reciting the history of Mountain Hill's various applications for development beginning with the first one filed on September 19, 2000, the judge reviewed the law relevant to the effect of the 2004 AAC ordinances on Mountain Hill's October 2003 as-of-right plan. He observed that under the time-of-decision rule a municipality is free to change its zoning ordinance even in response to a site-plan application. However, the time-of-decision rule, he noted, is not automatic. Rather, he observed, "[a] court may consider equitable factors to determine whether the retroactive application of an amended ordinance would result in a manifest injustice." The judge concluded that the time-of-decision rule should govern the October 2003 application because the AAC ordinance served a significant public interest as expressed in the "Reasons Resolution" adopted simultaneously with the AAC ordinance. There, the Township Committee found that:
[i]t has become clear in the years since the adoption of the 1993 Master Plan that placing of an extensive mixed use commercial/retail, office, residential development, of a "Town Center" nature and intensity at this location is ill advised and not sound planning and zoning for the Township. Continuation of the *27 PD zone at this location would result in ultimate development that will radically effect [sic] . . . the character and livability of the Middletown community in a negative way.
The judge pointed to the significant public controversy aroused by the development plan and concluded that the "`nature, extent and degree of the public interest to be served by the ordinance amendment' constitutes a substantial weight on the time of decision scale."
The judge then considered the equitable factors that might prohibit application of the time-of-decision rule. First, he examined Mountain Hill's contention that the Planning Board acted improperly in seeking an injunction and that it was, thus, entitled to rely on the "vested rights" exception. The judge rejected this claim because he "found it necessary to issue the injunction based on jurisdictional concerns, case management principles, and the preservation of judicial and municipal resources." He found that "it was not the actions of the Planning Board [that] led to this court's restraining order, but rather, the ill-advised actions of Mountain Hill to continue filing development applications while multiple lawsuits were still pending that compelled this court to issue the injunction." Second, the judge concluded that the cases cited by Mountain Hill were all distinguishable on the facts because the statutory approval processes had all been exhausted by the applicant. However, there had been no public hearings on Mountain Hill's October 16, 2003, application and the Planning Board had no opportunity to act upon it. In fact, the application had not even been deemed complete at the time the injunction issued. As such, the judge concluded that Mountain Hill was not entitled to rely on the vested-rights exception to the time-of-decision rule.
On August 2, 2005, the judge entered an order that vacated the portions of the December 18, 2003, order precluding Mountain Hill from filing any new applications for development, including the October 16, 2003, application and providing that any such application would be subject to the AAC ordinance. This is the second order from which Mountain Hill appeals.
As described by the judge, the only remaining issues to be determined were whether the AAC ordinance was "clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of zoning or the statute," citing Bow & Arrow Manor, Inc. v. Town of West Orange, 63 N.J. 335, 343, 307 A.2d 563 (1973), or whether it constituted impermissible inverse spot zoning. Those issues were tried by the judge on June 21, July 27-28 and August 2, 2006. The witnesses who testified were Henry Ney, from Schoor DePalma, Inc.; Richard Preiss, from Phillips Preiss Shapiro Associates, Inc.; Richard Cramer, from T & M Associates; Thomas Thomas, from Thomas Planning Associates; Anthony Mercantante; and Frederick Hofmann, also from T & M Associates. The attorneys returned on August 2, 2006, to present their summations and the judge reserved decision.
On October 22, 2006, the judge issued an opinion in L-2378-04 finding that the Township Committee did not act in an arbitrary, capricious or unreasonable manner in designating Mountain Hill's property as an AAC zone and that it did not constitute impermissible spot zoning. Based upon the evidence admitted during the trial, and after describing the subject property, the judge made the following findings of fact:
In mid 2000, Plaintiff unveiled conceptual plans for a "Town Center." The Town Center was to consist of retail or office space, apartments or townhouse *28 units and parking lots or structures for almost 5,000 vehicles. The unveiling resulted in public controversy and reaction due to its size, intensity, location and traffic impact.
The Township Committee became concerned with capacity limitations and traffic congestion along Route 35 and therefore, in 1998, the Township Committee authorized T & M Consulting to perform a traffic study. The study was completed in May 1999. The study analyzed the Route 35 corridor as it related to the existing zoning and projected development. The study used then current build-out projections premised on then current zoning, to determine that by the year 2020, 12 (twelve) out of the 13 (thirteen) Route 35 intersections in Middletown would be at "failure" levels at peak hours. Based on the study, the Township Committee discussed and explored various zoning amendments or techniques to decrease the projected intensity of development along the Route 35 corridor to manageable levels. The Township Committee held such meetings during 1999-2000.
In July 2001, the Township Committee introduced an ordinance proposing to re-zone [sic] and decrease the intensity of development in the PD zone. The ordinance received only 3 affirmative votes and after legal challenge, the ordinance was found to be invalid. . . .
In 2002, Plaintiff submitted an application to the Zoning Board of Adjustment, seeking a use variance to utilize the 55 acre M1 zoned area in accord with the 82 acre PD zone standard. The Zoning Board denied Plaintiff's application. During this time, the Planning Board completed the 2003 Master Plan. The 2003 Master Plan recommended that the PD zone be changed because a need for a Town Center located in the center of Middletown no longer remained. Essentially, the Planning Board reasoned that the overall concept of a Town Center would best serve the community by encouraging renovation and renewal of existing "Village Centers" in Middletown. Therefore, due to concerns regarding traffic and the lessened need for brand new Town Centers, the Planning Board recommended that that PD zoned area be re-zoned [sic] to an AAC zone permitting up to 4 dwelling units per acre with a possible limited commercial component.
The Plaintiff, the primary land owner, challenged the validity of the 2003 Master Plan. . . .
In compliance with the action of this court, the Planning Board prepared a new comprehensive 2004 Master Plan, which was adopted on October 27, 2004. To preclude and address legal concerns arising from the adoption of the 2003 Master Plan, all ordinances adopted since the 2003 Master Plan's enactment were ratified and re-adopted [sic], pursuant to Municipal Land Use Law. Accordingly, the Planning Board re-adopted [sic] Ordinance # 2004-2798, on December 6, 2004, thereby re-establishing [sic] the AAC zone on the basis that the Town Center would be detrimental to existing Village Centers and the traffic impact would be adverse to the Township.
After stating the parties' arguments, the court held that the Township Committee did not act in an arbitrary, capricious or unreasonable fashion in designating a sizeable portion of the subject property in an AAC zone because, after the 1993 Master Plan was adopted, Middletown "experienced substantial traffic growth, including and affecting the Route 35 corridor." The T & M study "indicated that the traffic capacity of Route 35 would be significantly *29 exceeded if allowed to be developed at then currently permitted intensities." The Township Committee specifically determined that the Town Center "would adversely affect the Route 35 corridor."
The judge also found that the Planning Board adopted a new 2003 Master Plan "with a land use element containing recommendations for various zoning amendments, to include a recommendation that the PD zoned area become re-zoned [sic] to AAC." After that plan was invalidated, the Planning Board prepared a new comprehensive Master Plan that was adopted on October 27, 2004. The judge also found "that the Township Committee's purpose and intent of rezoning the area as AAC is to enable the planned development of a residential retirement community." The judge concluded that Mountain Hill had not shown that the AAC ordinance was clearly arbitrary, capricious or unreasonable.
The judge then turned to Mountain Hill's argument that the AAC zone lacks a connection to any public purpose and that the master plans, ordinances and resolutions designating its property as an AAC zone provide no legitimate zoning reason for this designation. The judge rejected Mountain Hill's argument, finding that the Township Committee resolutions specifying findings and reasons for adoption of the AAC ordinance established that the Town Center would cause great detriment and congestion in the Village Historic District, where streets are narrow and cannot be expanded without destruction of the historic character of the area. The judge found that "the Township Committee reasoned that the AAC zone allows and permits Plaintiff to make a reasonable and balanced use of its property, while avoiding and eliminating the adverse impacts the Township of Middletown would incur if the PD zone remained, and the proposed Town Center developed." Furthermore, the judge found the Township Committee reasonably relied on the opinion of Thomas that the AAC zone was a legitimate zone designation for the subject property due to traffic concerns and on the opinion of T & M that the Route 35 corridor would fail if full development was permitted. The judge concluded that the AAC zone "does in fact have a public purpose" and that the Township Committee did not act in an arbitrary, capricious or unreasonable manner.
Lastly, the judge rejected Mountain Hill's claim of impermissible inverse spot zoning because the Township Committee rezoned the subject property only after consultation with the public, planners, and experts[22] based on the two AAC ordinances and Resolution #2004-125. The judge found that Middletown had "experienced a period of extensive and intensive retail and commercial growth along the Route 35 corridor, in which many of the existing retail shopping centers were upgraded or expanded, and additional new shopping centers were constructed," citing the above ordinances and resolution to support this finding. He continued:
Due to this growth, the Township re-zoned [sic] the PD area to a less traffic intensive use. The court is unable to find evidence of inverse spot zoning. The court finds that the Township Committee tried to balance the Plaintiff's reasonable use of the property with the impact that such use would have upon the Township. The court finds that such balance resulted in the AAC zone designation. Therefore, the court holds *30 that the AAC zone designation does not constitute impermissible inverse spot zoning and accordingly, the court will not overturn the AAC zone designation.
An order of November 17, 2006, dismissed "the remaining substantive claims of the plaintiff Mountain Hill L.L.C. as to the validity of the 2004 Township Master Plan and the AAC zoning Ordinance 2004-2760 as re-adopted [sic] by Ordinance 2004-2798" and dismissed the complaints under Docket Nos. L-2378-04, L-5591-04 and L-0296-05. This is the third and final order from which Mountain Hill appealed on January 2, 2007.

III.
Mountain Hill contends with respect to the April 22, 2005, order that the judge erred in concluding that Smith had no conflict of interest when she voted on the AAC ordinances. It also argues that the judge erred in concluding that Middletown complied with the procedural notice requirements of the MLUL in adopting the AAC ordinances and that it did so without receiving a proper report, written or not, from the Planning Board.
With respect to the August 2, 2005, order, Mountain Hill asserts that the judge erred when he concluded that the time-of-decision rule applied to Mountain Hill's October 16, 2003, as-of-right development application.
Finally, with respect to the November 17, 2006, order Mountain Hill claims that the process by which its property was rezoned as AAC was inherently flawed and thus arbitrary, capricious and unreasonable, requiring that the ordinance be overturned. It urges that the AAC zone lacks any public purpose, also making it arbitrary, capricious and unreasonable. It further contends that the judge erred when he justified the rezoning based on traffic conditions. Finally, it argues that the AAC rezoning was impermissible inverse spot zoning and that the judge erred in upholding the AAC ordinance.
Our review of the judge's findings of fact based on the testimony presented during the plenary hearings is limited.
Considering first the scope of our appellate review of judgment entered in a non-jury case, as here, we note that our courts have held that the findings on which it is based should not be disturbed unless "they are so wholly insupportable as to result in a denial of justice," and that the appellate court should exercise its original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter. That the finding reviewed is based on factual determinations in which matters of credibility are involved is not without significance. Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence. It has otherwise been stated that "our appellate function is a limited one: we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice," and the appellate court therefore ponders whether, on the contrary, there is substantial evidence in support of the trial judge's findings and conclusions.
[Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84, 323 A.2d 495 (1974), (citations omitted).]
See also Sager v. O.A. Peterson Const. Co., 182 N.J. 156, 163-64, 862 A.2d 1119 (2004); Pheasant Bridge Corp. v. Twp. of Warren, 169 N.J. 282, 293, 777 A.2d 334 (2001), cert. denied, 535 U.S. 1077, 122 S.Ct. 1959, 152 L.Ed.2d 1020 (2002); Mizrahi v. Cannon, *31 375 N.J.Super. 221, 227, 867 A.2d 490 (App.Div.2005). We only determine "`whether the findings made [by the trial court] could reasonably have been reached on sufficient credible evidence present in the record.'" Sebring Assocs. v. Coyle, 347 N.J.Super. 414, 424, 790 A.2d 225 (App.Div.) (quoting State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964)), certif. denied, 172 N.J. 355, 798 A.2d 1269 (2002). We are not in a good position to judge credibility and, ordinarily, should not make new credibility findings. Dolson v. Anastasia, 55 N.J. 2, 7, 258 A.2d 706 (1969); Trusky v. Ford Motor Co., 19 N.J.Super. 100, 104, 88 A.2d 235 (App.Div.1952). It is only where we are "`thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction [that we] then, and only then,'" make our own findings and conclusions. Ridley v. Dennison, 298 N.J.Super. 373, 378, 689 A.2d 793 (App.Div.1997) (quoting Johnson, supra, 42 N.J. at 162, 199 A.2d 809).
However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995). Thus, our review of the judge's interpretations of law and the applications of law to facts is de novo.

IV.
As we understand its argument, Mountain Hill contends that Smith had a direct pecuniary interest in securing favorable treatment for her clients, Joseph J. Azzolina, Jr., and Judith Azzolina, and would have expected to be rewarded with future title work from them and any of the multiple businesses in which they have or had an interest in Monmouth County, including Mountain Hill. Mountain Hill asserts that the issue of a conflict of interest must be evaluated through the eyes of the public at the time that municipal action was pending and not with hindsight based on how Smith actually voted. It argues that a member of the public would perceive that Smith had a conflict of interest and she should have been disqualified.
Middletown, on the other hand, urges that the title work done for Joseph J. Azzolina, Jr., in 1998 was "routine, ordered through an attorney, and merely one of thousands of routine house title transaction[s] by Smith's title business over the years." It argues that such a "routine incidental matter" is no basis for disqualification, particularly because it would paralyze the municipality from rezoning the property.[23] Second, Middletown argues that the conflict claim respecting Judith Azzolina's refinance lacks bona fides and was a mere effort to secure Smith's disqualification in order to paralyze the Township Committee.[24] Mountain Hill further argues that this transaction, too, was just as routine as that for Joseph J. Azzolina, Jr., and not a basis for disqualification. Finally, it asserts that Smith was not aware that Joseph J. Azzolina, *32 Jr., and Judith Azzolina were involved with Mountain Hill and, thus, could not have disqualified herself.
The law governing conflicts of interest by public officials has a long history in New Jersey and elsewhere. In a seminal case, Wyzykowski v. Rizas, 132 N.J. 509, 523, 626 A.2d 406 (1993), our Supreme Court reviewed that long history.
The jurisdiction that we exercise with respect to the status and involvement of the appointees of the mayor or the role of the mayor himself derives from a source other than the Municipal Land Use Law. Our judicial system is historically vested with a comprehensive prerogative-writ jurisdiction, which it inherited from the King's Bench. We have frequently exercised that jurisdiction in the supervision of govern-mental tribunals, including administrative agencies.
[Id. at 522, 626 A.2d 406 (citing Avant v. Clifford, 67 N.J. 496, 520, 341 A.2d 629 (1975)).]
"That common-law jurisdiction is guaranteed under N.J. Constitution article VI, section 5, paragraph 4." Ibid. The common law imposes an obligation of fairness and impartiality on public officers, which must be enforced to ensure sound and efficient government. Id. at 523, 626 A.2d 406 (quoting Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 476, 86 A.2d 201, cert. denied, 344 U.S. 838, 73 S.Ct. 25, 97 L.Ed. 652 (1952)).
Thus, common-law principles concerning the participation of public officials in matters in which they have a personal interest primarily govern [such] dispute[s]. At common law "[a] public official is disqualified from participating in judicial or quasi-judicial proceedings in which the official has a conflicting interest that may interfere with the impartial performance of his duties as a member of the public body." Scotch Plains-Fanwood Bd. of Educ. v. Syvertsen, 251 N.J.Super. 566, 568, 598 A.2d 1232 (App. Div.1991). The Municipal Land Use Law codified the common-law principles, expressly prohibiting a planning board member from acting "on any matter in which [the member] has, either directly or indirectly, any personal or financial interest." N.J.S.A. 40:55D-23.b.
[Ibid.[25]]
The Wyzykowski Court summarized "the general guidelines for determining whether a particular interest is sufficient to disqualify" that it reviewed thirty-five years earlier in Van Itallie v. Borough of Franklin Lakes, 28 N.J. 258, 268-69, 146 A.2d 111 (1958). 132 N.J. at 523-24, 626 A.2d 406. In Van Itallie the plaintiff taxpayer challenged the validity of two ordinances on the ground that two councilmen had interests conflicting with their municipal duties: Councilman Birrer because (1) his brother was employed by a party interested in the adoption of the ordinance, (2) Birrer had a conversation with the executive vice-president of his brother's employer about locating a golf course in Franklin Lakes, and (3) he owned a forty-acre plot contiguous to land that would be rezoned; and Councilman Bender because (1) his eighty-four-year-old father had a life estate in an historical district created by one of the ordinances, and (2) one of his brothers was a tenant of the primary landowner whose property would be rezoned. 28 N.J. at 266-67, 272, 146 A.2d 111.
To resolve the claims of conflicting interests, the Supreme Court reviewed the applicable legal standards:
The decision as to whether a particular interest is sufficient to disqualify is necessarily a factual one and depends *33 upon the circumstances of the particular case. Aldom v. Borough of Roseland,. . . 42 N.J.Super. [495,] 503, 127 A.2d 190 [(App.Div.1956)]. No definitive test can be devised. The question will always be whether the circumstances could reasonably be interpreted to show that they had the likely capacity to tempt the official to depart from his sworn public duty. . . .
Local governments would be seriously handicapped if every possible interest, no matter how remote and speculative, would serve as a disqualification of an official. If this were so, it would discourage capable men and women from holding public office. Of course, courts should scrutinize the circumstances with great care and should condemn anything which indicates the likelihood of corruption or favoritism. But in doing so they must also be mindful that to abrogate a municipal action at the suggestion that some remote and nebulous interest is present, would be to unjustifiably deprive a municipality in many important instances of the services of its duly elected or appointed officials. The determinations of municipal officials should not be approached with a general feeling of suspicion, for as Justice Holmes has said, "Universal distrust creates universal incompetency." Graham v. United States, 231 U.S. 474, 480, 34 S.Ct. 148, 151, 58 L. Ed. 319, 324 (1913); see also Ward v. Scott (II), 16 N.J. 16, 105 A.2d 851 (1954).
[Id. at 268-69, 146 A.2d 111.][26]
In addition to the Van Itallie factors, the Wyzykowski Court observed:
Actual proof of dishonesty need not be shown. Aldom, supra, 42 N.J.Super. at 503, 127 A.2d 190. An actual conflict of interest is not the decisive factor, nor is "whether the public servant succumbs to the temptation," but rather whether there is a potential for conflict. Griggs v. Borough of Princeton, 33 N.J. 207, 219, 162 A.2d 862 (1960)[[27]] (citing Aldom, supra, 42 N.J.Super. at 502, 127 A.2d 190). A conflicting interest arises when the public official has an interest not shared in common with the other members of the public. Id. 33 N.J. at 220-21, 162 A.2d 862. Another way of analyzing the issue is to understand that "[t]here cannot be a conflict of interest where there do not exist, realistically, contradictory desires tugging the official in opposite directions." LaRue v. Township of East Brunswick, 68 N.J.Super. 435, 448, 172 A.2d 691 (App.Div.1961).
[Wyzykowski, 132 N.J. at 524, 626 A.2d 406.][28]
After reviewing the results reached in a variety of cases deciding common-law conflicts questions, the Court recognized a commentator's categorization of conflicts as falling into four basic types: (1) direct *34 pecuniary interests, (2) indirect pecuniary interests, (3) direct personal interests and (4) indirect personal interests. Id. at 525-26, 626 A.2d 406 (citing Michael A Pane, Conflict of Interest: Sometimes a Confusing Maze, Part II, New Jersey Municipalities, March 1980, at 8-9).
The Wyzykowski Court recognized the enactment of the Local Government Ethics Law (Ethics Law), N.J.S.A. 40A:9-22.1 to -22.25, subsequent to the events at issue before it. Wyzykowski, supra, 132 N.J. at 529, 626 A.2d 406. The Court observed that "[t]he common-law doctrines that attend the office of the local public official will be influenced by the recent enactment in 1991 of the . . . Ethics Law." Ibid. (emphasis added). After discussing the financial reporting requirements of the Ethics Law, the Court observed that this law "has refined the definition of conflict of interest." Ibid. The Ethics Law provides in pertinent part:
d. No local government officer or employee shall act in his official capacity in any matter where he, a member of his immediate family, or a business organization in which he has an interest, has a direct or indirect financial or personal involvement that might reasonably be expected to impair his objectivity or independence of judgment;
e. No local government officer or employee shall undertake any employment or service, whether compensated or not, which might reasonably be expected to prejudice his independence of judgment in the exercise of his official duties[.]
[N.J.S.A. 40A:9-22.5.]
The Wyzykowski Court noted that:
Cox interprets the use of the word "involvement" instead of "interest" to broaden the areas of disqualification to include perhaps even personal friendships. [William M.] Cox, New Jersey Zoning[and Land Use Administration] at 30 [(1993)]. He anticipates "a large number of appeals to the local ethics boards authorized to be established by municipalities and counties as well as an increased volume of litigation with respect to conflict issues until the courts have construed the meaning of the statute." Ibid.

[Wyzykowski, supra, 132 N.J. at 529-30, 626 A.2d 406.]
Although the Ethics Law had been enacted after the actions under review in Wyzykowski, the Court directed that "[f]uture decisions should be consistent with the principles of that Act." Id. at 530, 626 A.2d 406. The Court then considered whether a conflict of interest existed from the perspective of "a reasonably informed citizen" and found that the mayor's appointment of a planning board member who voted on the mayor's application while the mayor was still in office "involve[d] a particularly troubling exercise of [the self-]representation" permitted by the MLUL and found a disqualifying conflict of interest in the circumstances before it. Id. at 531, 626 A.2d 406.
In Thompson v. City of Atlantic City, 190 N.J. 359, 921 A.2d 427 (2007), the Court addressed the Ethics Law and again observed that "it is the potential for conflict, rather than proof of an actual conflict or of actual dishonesty, that commands a public official to disqualify himself from acting on a matter of public interest." Id. at 374, 921 A.2d 427 (citing Griggs, supra, 33 N.J. at 219, 162 A.2d 862, emphasis added). The Court concluded that the City's settlement agreement with the mayor and another official, which had been approved by appointees of the mayor, had to be set aside under the Ethics Law and Atlantic City's code of conduct. The Court required the mayor to return the settlement *35 monies because "`strong remedies' must be employed to deter improper conduct by public officials." Id. at 383, 921 A.2d 427 (quoting County of Essex v. First Union Nat'l Bank, 186 N.J. 46, 58, 891 A.2d 600 (2006)).
At all relevant times Smith was governed by the Ethics Law, which eschewed the common-law test of a financial interest and broadened the reach of the law to "financial or personal involvement." N.J.S.A. 40A:9-22.5(d) (emphasis added). Although, as in Shapiro v. Mertz, 368 N.J.Super. 46, 53, 845 A.2d 186 (App.Div. 2004), "we do not need to determine the outer boundary of the definition of `involvement,'" we must consider whether Smith had a financial involvement with Mountain Hill and some of its principals.
To construe the word "involvement" we consider the ordinary meaning of the word and the legislative history. DiProspero v. Penn, 183 N.J. 477, 492-93, 874 A.2d 1039 (2005). "Involve" means "[t]o have as a necessary circumstance, condition, or implication[;]. . . [t]o have effect on; affect;. . . [t]o drain into entanglement[;] . . . [t]o hold the attention of; engross[.]" Funk & Wagnalls New Comprehensive Int'l Dictionary of the English Language, Encyclopedic Ed. 670 (1978). In enacting the Ethics Law, the Legislature enunciated its findings and declarations:
a. Public office and employment are a public trust;
b. The vitality and stability of representative democracy depend upon the public's confidence in the integrity of its elected and appointed representatives;
c. Whenever the public perceives a conflict between the private interests and the public duties of a government officer or employee, that confidence is imperiled;
d. Governments have the duty both to provide their citizens with standards by which they may determine whether public duties are being faithfully performed, and to apprise their officers and employees of the behavior which is expected of them while conducting their public duties; and
e. It is the purpose of this act to provide a method of assuring that standards of ethical conduct and financial disclosure requirements for local government officers and employees shall be clear, consistent, uniform in their application, and enforceable on a Statewide basis, and to provide local officers or employees with advice and information concerning possible conflicts of interest which might arise in the conduct of their public duties.
[N.J.S.A. 40A:9-22.2.]
The judge here concluded that "title work for two individual members of Mountain Hill regarding property unrelated to the Town Center project[ ] is simply too remote and speculative to warrant a disqualification." Cases that have found an alleged conflict to be remote, nebulous, speculative, or attenuated have generally considered indirect personal or pecuniary conflicts of interest. See, e.g., Van Itallie, supra, 28 N.J. at 269, 272, 146 A.2d 111 (member's brother's employment in a subordinate position by corporation interested in zoning ordinance too remote to establish conflict of interest and member's father's life estate in newly created historical district too insubstantial to create conflict of interest); Lincoln Heights Ass'n v. Twp. of Cranford Planning Bd., 314 N.J.Super. 366, 378-80, 714 A.2d 995 (Law Div.), aff'd o.b., 321 N.J.Super. 355, 729 A.2d 50 (App. Div.), certif. denied, 162 N.J. 131, 741 A.2d 99 (1999) (approval of construction of grocery store near home of member's parents where they might go shopping not disqualified by conflict of interest); Petrick, supra, 287 N.J.Super. at 331-32, 671 A.2d *36 140 (conflict of interest based on occasional employment of planning board member's wife by applicant "too remote and too attenuated" where her employment status would not be enhanced by parking garage resolution).
Here, of course, Smith had an alleged direct pecuniary interest. Under the common law, we would consider whether Attorneys Land Title Agencies, Inc., is the alter ego of Smith for conflict-of-interest principles because she is the sole owner of that business. Jock v. Shire Realty, Inc., 295 N.J.Super. 67, 74, 684 A.2d 921 (App. Div.) (citing Coppa v. Taxation Div. Dir., 8 N.J. Tax 236, 245 (1986)) (holding that the appearance of a zoning board member before the board as an expert witness on behalf of the corporation solely owned by member and his wife created a conflict of interest for the other board members pursuant to the MLUL because his appearance required them to evaluate his credibility as the expert in the application), certif. denied, 148 N.J. 462, 690 A.2d 609 (1997). However, we need not resort to that common-law principle because the Ethics Law, which is clearly applicable here, specifically extends its reach to business organizations in which a local government officer or employee has an interest. N.J.S.A. 40A:9-22.5(d).
The fact that a public official had a direct involvement, as distinct from interest, has triggered a remoteness analysis. In Hughes v. Monmouth University, we recently considered whether members of the zoning board who were alumni of the university should have been disqualified from considering the university's application for a use variance because of their direct personal involvement with the university. 394 N.J.Super. 193, 925 A.2d 741 (App.Div.), certif. denied, 192 N.J. 599, 934 A.2d 640 (2007):
In 1996, the Local Government Ethics Law, N.J.S.A. 40A:9-22.1 to -22.5, was enacted, barring a public official, such as a member of a board of adjustment, see Haggerty v. Red Bank Borough Zoning Bd. of Adjustment, 385 N.J.Super. 501, 514, 897 A.2d 1094 (App.Div.2006), from acting in any manner in which he or she "has a direct or indirect financial or personal involvement that might reasonably be expected to impair his[/her] objectivity or independence of judgment." N.J.S.A. 40A:9-22.5(d) (emphasis added). The Ethics Law also extends the prohibition to immediate family members or business associates. Ibid.

As we indicated in Shapiro v. Mertz, 368 N.J.Super. 46, 53, 845 A.2d 186 (App.Div.2004), "[t]he Ethics Law expanded the definition of a conflict of interest which had been established through common law and codified by the MLUL, N.J.S.A. 40:55D-23b." Indeed, one of the leading land-use scholars believes that "the Ethics Law broadens the areas of disqualification at least by its extension of reach to the indirect involvements of family members and business associates." William M. Cox, Zoning and Land Use Administration, 3-1.2(d) at 50 (2007). According to Cox, "it is unclear whether the use of the word `involvement' instead of `interest' bears significance," but "intangible relations such as a friendship or being an alumnus of the same school as the applicant could be held to be grounds for disqualification depending upon the circumstances." Ibid.

[Id. at 197, 925 A.2d 741.]
We found it clear that an alumnus or alumna of a school has a direct personal "involvement" with that school. Ibid. We then considered whether that involvement was too remote to require disqualification and concluded that it was because

*37 the board members obtained their degrees many years ago, were not active alumni members, and did not substantially contribute to the University or otherwise evidence any special attachment to the school, no reasonable person could conclude that such involvement would have tempted them "to depart from [their] sworn public duty."
[Id. at 197-98, 925 A.2d 741 (citing Care of Tenafly, supra, 307 N.J.Super. at 369-70, 704 A.2d 1032; Barrett v. Union Twp. Comm., 230 N.J.Super. 195, 201, 553 A.2d 62 (App.Div.1989)).]
We also noted that none of the board members or their families was currently a student at the university. Id. at 197, 925 A.2d 741. We found that past attendance at the university by a member's child, who received a tuition credit available to all similarly situated students, "would not have interfered with the member['s] impartial performance of his duties." Id. at 198, 925 A.2d 741 (citing Wyzykowski, supra, 132 N.J. at 523, 626 A.2d 406.)
Similarly, the fact that a board member's child may in the future consider attending the University or that a member's company won a public bid and performed some work for the school over ten years ago, are both much too remote to constitute conflicts.
Furthermore, the fact that board members participated in various University events, such as concerts, wine tastings, and athletic events, would similarly not be disqualifying. None of these involvements, which were open to the public generally, could "reasonably be expected to impair [the board member's] objectivity or independence of judgment." N.J.S.A. 40A:9-22.5(d).
[Id. at 198-99, 925 A.2d 741 (citations omitted).]
Thus, we concluded that the alumni board members were not disqualified from deciding the university's use variance application. Id. at 199, 925 A.2d 741.
Middletown contends that a conflict based on title work can only be found where the title work is contemporaneous, as in Dover Township Homeowners and Tenants Association v. Township of Dover, 114 N.J.Super. 270, 274, 276 A.2d 156 (App.Div.1971). Lawyers Title did all the title work for the applicant's project as well as the entirety of the owner's other projects. Ibid. We held:
Where a member of a planning board having an interest prohibited by [N.J.S.A. 40:55-1.4, now N.J.S.A. 40:55D-23] participates in planning board action, such action is invalid regardless of the amount of interest shown.
As a member of the planning board, Miller was obliged to determine whether the Planned Unit Development of defendant was in the best interest of the township. He might, therefore, be required to make a decision which would be detrimental to the defendant. It is perfectly obvious that if he had a sufficient interest based upon his relationship with defendant, there would be a conflict. In his position as manager of the Toms River office of Lawyers Title Insurance Company, it was in the interest of Miller's employer that the application for the Planned Unit Development be approved for the additional title work that would be required. The statement of the two interests indicates the conflict.
The interest of Miller tainted both actions of the planning board so that they are invalid because of his participation regardless of the lack of any allegation of fraud or bad faith.
[Id. at 276, 276 A.2d 156 (citations omitted).]
*38 This case simply does not require that title work be literally contemporaneous with the public official's discharge of public duties in order to require disqualification. It is in no way inconsistent with the above analysis of the Ethics Law and the concept of remoteness.
The fundamental question here is whether Smith's title work had the capacity to impair her objectivity or independence of judgment and "tempt [her] to depart from [her] sworn public duty." Van Itallie, supra, 28 N.J. at 268, 146 A.2d 111. In answering that question, we must be vigilant "of our uncompromising concern 'for the impartial exercise of quasi-judicial authority.'" Care of Tenafly v. Tenafly Zoning Bd. of Adjustment, 307 N.J.Super. 362, 377, 704 A.2d 1032 (App. Div.), certif. denied, 154 N.J. 609, 713 A.2d 500 (1998) (citing McVoy v. Bd. of Adjustment of Montclair Twp., 213 N.J.Super. 109, 116, 516 A.2d 634 (App.Div.1986)). Furthermore, we must consider "the circumstances of the particular case" because the decision "is necessarily a factual one." Van Itallie, supra, 28 N.J. at 268, 146 A.2d 111.
The circumstances of this case begin with the involvement of Joseph J. Azzolina, Sr., with the Township Committee in the early 1990's. At that time, Smith was a member of the Township Committee and from time to time over the next twelve years served as Middletown's mayor.[29] In 1998 Smith performed title work for Joseph J. Azzolina, Jr., and Judith Azzolina in connection with their purchase of a home for each of them. Despite her knowledge that Joseph J. Azzolina, Sr., and then Mountain Hill intended to make an application for development, in early 2000 Smith undertook to provide title work for Mountain Hill and Azzolina Land Corp. on properties they were acquiring to increase the size of the Town Center above eighty-five acres.
It was also in early 2000 that Mountain Hill unveiled its Town Center conceptual plan and sought to have the portions of its property within the M-1 zone included in the PD zone. On May 3, 2000, the Township Committee received the T & M Associates Route 35 Corridor Study that it had earlier commissioned, which suggested concerns about a full build-out of properties along that corridor. Finally, it was in the fall of 2000 that Mountain Hill sought a development permit from the Planning Board and Mercantante determined that use variances were required. Throughout this time, Smith continued to work on the title searches for Mountain Hill.
It was not until sometime in October that Smith apparently recognized that she had a conflict of interest and, rather than disqualify herself from any involvement on matters affecting Mountain Hill, terminated her work on Mountain Hill's purchase transactions. By then, Smith had done a considerable amount of work for Mountain Hill. She testified that when she withdrew she "lost a lot on those files. They're very fat, take up a lot of room in the garage" where she stores closed files. She admitted that she was reimbursed for her costs in conducting state and municipal searches and other expenses, but she did not state by whom she was reimbursed. Smith testified that she lost $6000 in fees that she would have realized had she finished the work. However, she believed that it was important that she preserve her ability to vote because a supermajority was required to enact any ordinance affecting *39 Mountain Hill's property if it submitted a notice of protest.
Having terminated her work for Mountain Hill, Smith participated with the Township Committee in considering the open space ordinance that was adopted on February 20, 2001. Over Mountain Hill's protest that Smith had a disqualifying conflict of interest, she also participated with the Township Committee in considering the down-zone ordinance that was adopted on May 21, 2001. Mountain Hill's protest was well taken.
The Township Committee contends that Smith declined the title work for Mountain Hill so that she could meet her municipal obligations and the judge found that "Attorneys Land Title has not performed any title work for Mountain Hill." The judge's finding is not supported by the record and the Township Committee has not called any case to our attention that permits a municipal official to avoid a conflict by terminating a direct financial involvement with an applicant or interested party.
Here, from Smith's description of the size of the title files on Mountain Hill's two property acquisitions, property that was the subject of the PD zone and the Azzolinas' and Mountain Hill's development efforts for over seven years, her involvement with the project was certainly significant. A reasonably informed citizen who knew of that significant involvement, and also knew that Smith issued title policies to two of Mountain Hill's principals, might reasonably expect that Smith's objectivity or independence of judgment respecting the 2001 ordinances would be impaired.
We are not persuaded by the Township Committee's argument that the conflict evaporated in October of 2000. If we were to confine the phrase "direct or indirect financial or personal involvement" to times contemporaneous to the municipal action, we would not be advancing "the public's confidence in the integrity of its elected and appointed representatives," N.J.S.A. 40A:9-22.2(b), because a member of the public, id. at22.2(c), might reasonably perceive that a significant and relatively recent, albeit it former, involvement with a party directly affected by the 2001 ordinances would impair the local government officer's "objectivity or independence of judgment." N.J.S.A. 40A:9-22.5(d). This is especially so where the adoption of the ordinance and the development of the Town Center were hotly contested, as in Aldom, supra, 42 N.J.Super. at 506-07, 127 A.2d 190. Even under common-law and MLUL principles, a former interest can trigger a disqualifying conflict. In Haggerty we concluded that a zoning board member was disqualified from hearing an application based on her father's of-counsel status with a law firm that formerly represented one of the applicants. Haggerty, supra, 385 N.J.Super. at 516-17, 897 A.2d 1094.
Smith's conflict of interest would have provided an alternate ground for the invalidation of the 2001 open-space and down-zone ordinances. Under the common law and the Ethics Law, a disqualifying direct financial interest or involvement is sustainable under the particular facts and circumstances present in this case. Aldom, supra, 42 N.J.Super. at 507, 127 A.2d 190. Smith formerly had an interest that was not shared in common with other members of the public. Wyzykowski, supra, 132 N.J. at 524, 626 A.2d 406. It was certainly not an interest that was at all remote in time vis-à-vis the 2001 ordinances nor was it speculative. Van Itallie, supra, 28 N.J. at 268, 146 A.2d 111. Mountain Hill was only required to show the potential for conflict, Griggs, supra, 33 N.J. at 219, 162 A.2d 862, and it has done so. The circumstances could reasonably be interpreted to show that Smith's interest or involvement *40 had the likely capacity to tempt Smith to depart from her sworn duties. Van Itallie, supra, 28 N.J. at 268, 146 A.2d 111. Mountain Hill was not required to prove actual dishonesty, Aldom, supra, 42 N.J.Super. at 503, 127 A.2d 190, or that Smith succumbed to the temptation. Griggs, supra, 33 N.J. at 219, 162 A.2d 862.
This conclusion brings us to consider the effect of this conflict of interest on the April 7, 2004, AAC ordinance, the subsequent 2004 Master Plan and the December 6, 2004, AAC ordinance. We are not persuaded that the conflict arising from the title work in 1998 and 2000 was so remote in time that it did not taint the performance of Smith's municipal obligations in 2004. Additionally, even if Smith's former direct financial involvement with Mountain Hill and its principals was not alone sufficient to require disqualification in 2004, and we are satisfied that it was, the fact of the former conflict, as one of the circumstances of this case, supports a conclusion that Smith's issuance of a refinance title policy on Judith Azzolina's home in 2003 just a few months before the vote on the first AAC ordinance required immediate disqualification from any consideration of the ordinance. Furthermore, Smith's responsibility in 2004 to respond to title inquiries respecting that refinance and the original searches she did on the title into Joseph J. Azzolina, Jr., and Judith Azzolina was yet another "involvement" in 2004 that disqualified Smith from voting on the 2004 Master Plan and the December 6, 2004, AAC ordinance, whether or not she knew of their status as members of Mountain Hill, especially when she had done considerable title work for the Town Center project itself. We disagree with the judge's conclusion that these involvements were "remote and speculative." We conclude that Smith had a disqualifying conflict of interest that infected not only her official actions in 2001 but also those in 2004. As a consequence, the 2004 Master Plan and both 2004 AAC ordinances are invalid and of no effect.
The invalidation of the 2004 Master Plan leaves the 1993 Master Plan governing development in Middletown. If the Planning Board wishes to revise the 1993 Master Plan, it will have to begin anew, just as it was required to do when the 2003 Master Plan was invalidated based on a disqualifying conflict of interest on the part of four other members of the Planning Board. In the meantime, the Planning Board has the October 16, 2003, as-of-right Application for Development Permit before it, Mountain Hill having fully complied with the December 1, 2003, out-of-time request for additional information. By virtue of our decision in Mountain Hill IV, it also has the January 3, 2003, first as-of-right Application for Development Permit and the August 27, 2003, amended second as-of-right Application for Development Permit before it. Mountain Hill IV, supra, at 250, 958 A.2d at 66. Mountain Hill shall promptly select the application it wishes to prosecute and the Planning Board shall proceed in accordance with the time constraints of the MLUL and Middletown's Development Regulations, if any.

V.
Because we have concluded that Smith had a disqualifying conflict of interest requiring invalidation of the 2004 Master Plan and both 2004 AAC ordinances, the issues raised by Mountain Hill respecting the procedural and notice requirements of the MLUL; the alleged arbitrary, capricious and unreasonable nature of the municipal actions before us; the time-of-decision rule; and impermissible inverse spot zoning have all been rendered moot. Nonetheless, we must comment upon the *41 judge's approach to resolving the claimed exception to the time-of-decision rule as we anticipate that the issue may arise in the future.
The general rule is that the last municipal ordinance controls an application for site plan approval during the pendency of the matter. Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 379, 658 A.2d 1230 (1995). However, equity may demand exceptions. Cox, New Jersey Zoning at 641; see also Odabash v. Mayor and Council of Borough of Dumont, 65 N.J. 115, 124, 319 A.2d 712 (1974) ("[T]he test of invalidity is not necessarily the complete unusability of the property involved for the now[-]permitted uses, but rather whether, in view of the extent of the now[-]prohibited uses in the close vicinity of the parcel, its value will be substantially depreciated and its marketability great[ly] impaired if the prohibited uses are not allowed.") (citations omitted). Here, the judge considered only the circumstances surrounding the October 16, 2003, Application for Development Permit and the 2004 Master Plan and AAC ordinances. This is too narrow a view of the circumstances that may equitably demand an exception.
If again called upon to consider the time-of-decision rule respecting Mountain Hill's Town Center project, the judge should consider the entire history of this project from its inception, including but not limited to (1) the February 20, 2001, adoption of the open-space ordinance, which was invalidated on December 11, 2001, because Brodsky had a disqualifying conflict of interest; (2) the July 2, 2001, adoption of the down-zone ordinance, which was struck down because there were insufficient votes for a supermajority; (3) the October 15, 2002, erroneous determinations by the Zoning Board that vertical parking garages were to be included in gross floor area and that retention basins were to be excluded from open space, thus accomplishing by interpretation what had failed by ordinance; (4) the January 16, 2003, erroneous refusal by Hanko to forward the first as-of-right Application for Development Permit to the Planning Board based on the Zoning Board's erroneous interpretations of gross floor area and open space; (5) the January 2003 Master Plan designating Mountain Hill's property as an AAC zone, which was invalidated on a conflict of interest because four members of the Planning Board were members of an organization opposing the development; (6) Kachinsky's erroneous refusal on September 11, 2003, to forward Mountain Hill's amended second as-of-right Application for Development Permit to the Planning Board on the erroneous ground that use variances were required for cross-zone uses and zone-line setbacks; (7) the Zoning Board's erroneous determination on March 22, 2004, that variances were required for cross-zone driveways and zone-line setbacks; and (8) the adoption of the 2004 Master Plan and AAC ordinances which are hereby invalidated because Smith had a disqualifying conflict of interest. We express no opinion as to whether an exception to the time-of-decision rule should be found in the future but only note that a broader view of the circumstances should be employed and, if the facts are in dispute, a plenary hearing should be conducted.
Reversed and remanded for entry of judgments in Mountain Hill, L.L.C. v. Township Committee of the Township of Middletown and the Planning Board of the Township of Middletown, Docket No. L-2378-04, invalidating the April 7, 2004, AAC ordinance; in Mountain Hill, L.L.C. v. Planning Board of the Township of Middletown, Docket No. L-5591-04, invalidating the 2004 Master Plan; and in *42 Mountain Hill, L.L.C. v. Township Committee of the Township of Middletown, Docket No. L-0296-05, invalidating the December 6, 2004, AAC ordinance. We do not retain jurisdiction; however, the trial judge who presided over these three actions and the two actions we have addressed in Mountain Hill IV shall retain jurisdiction and supervise the timely conduct of proceedings by the Planning Board on the Application for Development Permit selected by Mountain Hill for the Board's consideration.
NOTES
[1] The October 31, 2003, complaint filed by the Planning Board against Mountain Hill under Docket No. L-5008-03 was dismissed on motion as improvidently filed before Mountain Hill answered the complaint. The dismissal order of December 18, 2003, also denied motions to intervene filed by the Township and the Zoning Board of Adjustment of the Township of Middletown (Zoning Board) and entered an injunction precluding Mountain Hill "from filing any new applications" with the Planning Board or Zoning Board. The order defined "new applications" as "any application that was perfected as of December 2, 2003." We understand from statements made by the Law Division judge that he intended the September 21, 2004, consolidation order (which is not included in the record) to sever the injunction from the December 18, 2003, dismissal order and to continue that injunction in the action under Docket No. L-2378-04 so that the injunction ran continuously. Mountain Hill in its Notice of Appeal included the dismissed action in its caption. Obviously, the time to appeal the December 18, 2003, order has long since expired. For this reason and to make the alignment of the parties clear, we dismiss the L-5008-03 portion of Mountain Hill's appeal as improvidently filed and do not include that action in the caption of this opinion. We do, however, address the entry of the injunction and its continued maintenance in the case bearing Docket No. L-2378-04 as though it had been entered therein as effective on December 2, 2003.
[2] A fifth appeal was scheduled for oral argument before us on April 7, 2008, and decided in July. Middletown Twp. v. Mountain Hill, L.L.C., Docket No. A-5857-06, 2008 WL 2811592 (App.Div. Jul. 23, 2008).
[3] We recognize that citation to unpublished opinions is generally prohibited by Rule 1:36-3. However, we cite Mountain Hill II for the history of Mountain Hill's development efforts with respect to its property, a use which falls within the exception to the rule. Pressler, Current N.J. Court Rules, comment 2 on R. 1:36-3 (2008). Of course, Mountain Hill II is also binding on Middletown and may be cited for that purpose. Eherenstorfer v. Div. of Pub. Welfare, 196 N.J.Super. 405, 411, 483 A.2d 212 (App.Div. 1984).
[4] As of December 12, 2003, members of Mountain Hill included John F. Azzolina; Joseph J. Azzolina, Jr.; Judith Ann Azzolina; Mary Ann Azzolina-Orzechowski; Joseph Azzolina, Joseph J. Azzolina, Jr. and John F. Azzolina as Co-Trustees of the Azzolina Trust; Philip J. Scaduto; Louis J. Scaduto, Jr.; Carol Ann Tarpey; and Philip J. Scaduto, Louis J. Scaduto, Jr. and Carol Ann Tarpey as Co-Trustees of the Scaduto Trust. The Scadutos are members of the Azzolina family, Grace Scaduto being the sister of Joseph J. Azzolina, Sr.
[5] The record on appeal does not reveal whether Middletown followed this particular recommendation when it subsequently amended its Development Regulations.
[6] Mountain Hill appealed the adoption of Open Space Ordinance No. 2001-2617 to the Law Division and on December 11, 2001, the judge concluded that the ordinance was invalid because it conflicted with the definition of "open space" in N.J.S.A. 40:55D-5 and because Brodsky, who voted to approve "the ordinance[,] had a disqualifying conflict of interest." Mountain Hill II, supra, slip op. at 2. The Township filed a Notice of Appeal on December 20, 2001, and we later affirmed the invalidation of the ordinance based only on Brodsky's conflict of interest. Id. at 16.
[7] This application proposed to construct a total of 1,565,364 square feet of space.
[8] On January 15, 2003, Mountain Hill informed the Township attorney of the Zoning Board's interpretations of gross floor area and open space.
[9] This action, Mountain Hill, L.L.C. v. Hanko, Docket No. L-0492-03, was soon dismissed for failure to exhaust administrative remedies.
[10] The second as-of-right plan and application for development permit sought a consolidation subdivision of all lots except lot 58 and it eliminated the vertical parking garage and excluded the retention basins from open space.
[11] Ultimately, we reversed the judge's ruling that variances were required for the driveways. Id. at 249, 958 A.2d at 66. We affirmed the judge's ruling that cross-zone buildings could only have uses permitted in the M-1 zone. Id. at 249-50, 958 A.2d at 66. And we affirmed the judge's determination that the various lots can be consolidated into one split-zoned lot. Id. at 249-50, 958 A.2d at 66.
[12] On September 11, 2003, Mountain Hill filed another prerogative-writ action, Mountain Hill, L.L.C. v. Mercantante, Docket No. L-4131-03, seeking a default approval of the January 3, 2003, application as amended. This action was dismissed for failure to state a claim for which relief could be granted.
[13] This opinion was issued one day after the Zoning Board began hearing Mountain Hill's September 17, 2003, appeal and application for interpretation with respect to the denial of the second amended as-of-right plan.
[14] On January 9, 2004, the judge entered a corrected order which presumably inserted the word "not" where we have inserted it, but it is not in the appendices on appeal.
[15] The judge later explained on March 14, 2005, that "perfected" meant "completed" as of December 2, 2003, and the Planning Board was entitled to refuse to accept the application on December 12, 2003, when the amended application was filed.
[16] The MLUL requires the mayor to be a member of the planning board. N.J.S.A. 40:55D-23(a).
[17] On April 30, 2004, Mountain Hill filed a prerogative-writ action under Docket No. L-1964-04 challenging the Zoning Board's March 22, 2004, decision. Mountain Hill IV, supra, at 229, 958 A.2d at 53. The judge reversed two of the Board's adverse conclusions and we now reverse the third one. Id. at 229-33, 958 A.2d at 53-56.
[18] The record on appeal does not contain a copy of the original complaint; we do not know the date on which it was filed. On September 21, 2004, an order was entered consolidating the dismissed action under Docket No. L-5008-03 with Mountain Hill's newly filed action under Docket No. L-2378-04.
[19] On December 13, 2004, the judge concluded that no irreparable harm existed to warrant the imposition of the restraints that Mountain Hill had requested. He marked the order "denied" and provided Fox with a copy. The judge stated that "[t]he complaint will proceed in the normal course."
[20] In his opinion on the time-of-decision rule, the judge indicated that "the Planning Board agreed to stipulate that Mountain Hill's application was a fully conforming site plan and, thus, entitled to approval on an `as-of-right' basis under the Township's previous ordinances." We do not find this particular stipulation in the record.
[21] Although he quoted the body of the notice, the judge did not comment on the absence of the date when the public hearing on the AAC ordinance would take place, although N.J.S.A. 40:49-2.1 appears to require this information.
[22] The record does not reveal whether Middletown had any need for an active adult community in 2003 and 2004.
[23] It is not correct to state that the Township Committee would be paralyzed because there were still four other members of the Township Committee who were empowered to amend the zoning ordinance by unanimous vote and by now, presumably, Smith is no longer on the Township Committee.
[24] There is no record support for this contention. Smith testified that, in the case of a refinance, it was common for the attorney to return to the company that did the initial title work because that work was already done and the refinance title work was less expensive when the attorney used the same company. Accordingly, we do not consider this unsupported contention.
[25] Zoning Board members are subject to the same interdiction. N.J.S.A. 40:55D-69.
[26] The Court concluded that the identified interests of both committeemen were too remote and speculative to support their disqualification. Id. at 270-73, 146 A.2d 111.
[27] The Supreme Court in Griggs recognized that the officials had no awareness of the "interlocking interests" requiring disqualification there and observed: "Nevertheless, it is the existence of such interests which is decisive, not whether they were actually influential." Griggs, supra, 33 N.J. at 219, 162 A.2d 862. As a consequence, Smith's professed lack of knowledge respecting the status of Joseph J. Azzolina, Jr., and Judith Azzolina as members of Mountain Hill is irrelevant.
[28] Stated another way, "`[t]he appearance of impropriety "must be something more than a fanciful possibility."'" Petrick v. Planning Bd. of the City of Jersey City, 287 N.J.Super. 325, 331, 671 A.2d 140 (App.Div.1996) (citing Aronowitz v. Planning Bd. of Lakewood, 257 N.J.Super. 347, 352, 608 A.2d 451 (Law Div. 1992)).
[29] In January of 2005 Smith testified that she had been a Committee member for twelve years, i.e., since 1993.